COOK *v.* GRALIKE ET AL.

No. 99–929. Argued November 6, 2000—Decided February 28, 2001

512

STEVENS, J., delivered the opinion of the Court, in which SCALIA, KENNEDY, GINSBURG, and BREYER, JJ., joined, in which SOUTER, J., joined as to Parts I, II, and IV, and in which THOMAS, J., joined as to Parts I and IV. KENNEDY, J., filed a concurring opinion, *post*, p. 527. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 530. REHNQUIST, C. J., filed an opinion concurring in the judgment, in which O'CONNOR, J., joined, *post*, p. 530.

*James R. McAdams* argued the cause for petitioner. With him on the briefs were *Jeremiah W. (Jay) Nixon*, Attorney General of Missouri, *James R. Layton*, State Solicitor, and *Tina M. Crow Halcomb* and *J. Eric Durr*, Assistant Attorneys General.

*Jonathan S. Franklin* argued the cause for respondents. With him on the brief were *H. Christopher Bartolomucci* and *Arthur A. Benson II.*

*Deputy Solicitor General Underwood* argued the cause for the United States as *amicus curiae* urging affirmance.

With her on the brief were *Solicitor General Waxman, Assistant Attorney General Ogden, Paul R. Q. Wolfson,* and *Douglas N. Letter.*[*]

JUSTICE STEVENS delivered the opinion of the Court.

In *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779 (1995), we reviewed a challenge to an Arkansas law that prohibited the name of an otherwise eligible candidate for the United States Congress from appearing on the general election ballot if he or she had already served three terms in the House of Representatives or two terms in the Senate. We held that the ballot restriction was an indirect attempt to impose term limits on congressional incumbents that violated the Qualifications Clauses in Article I of the Constitution rather than a permissible exercise of the State's power to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives" within the meaning of Article I, § 4, cl. 1.

In response to that decision, the voters of Missouri adopted in 1996 an amendment to Article VIII[1] of their State Constitution designed to lead to the adoption of a specified "Congressional Term Limits Amendment" to the Federal Constitution. At issue in this case is the constitutionality of Article VIII.

---

[*]Briefs of *amici curiae* urging reversal were filed for the State of Nebraska by *Don Stenberg,* Attorney General, and *L. Steven Grasz,* Deputy Attorney General; for the Initiative and Referendum Institute by *Patrick T. O'Brien* and *John M. Boehm;* for Missouri Term Limits by *Stephen J. Safranek;* and for U. S. PIRG Education Fund by *David Jonathan Fine.*

Briefs of *amici curiae* urging affirmance were filed for the James Madison Center for Free Speech by *James Bopp, Jr.,* and *Heidi K. Meyer;* and for the League of Women Voters of the United States et al. by *Louis R. Cohen* and *Jonathan J. Frankel.*

*Kris W. Kobach,* pro se, filed a brief as *amicus curiae.*

[1] We shall follow the parties' practice of referring to the amendment as "Article VIII" even though it merely added new §§ 15 through 22 to the pre-existing article.

514

I

Article VIII "instruct[s]" each Member of Missouri's congressional delegation "to use all of his or her delegated powers to pass the Congressional Term Limits Amendment" set forth in § 16 of the Article. Mo. Const., Art. VIII, § 17(1). That proposed amendment would limit service in the United States Congress to three terms in the House of Representatives and two terms in the Senate.[2]

Three provisions in Article VIII combine to advance its purpose. Section 17 prescribes that the statement "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" be printed on all primary and general ballots adjacent to the name of a Senator or Representative who fails to take any one of eight legislative acts in support of the proposed amendment.[3] Section 18 provides that the statement "DE-

---

[2] The full text of the proposed amendment is as follows:

"Congressional Term Limits Amendment

"(a) No person shall serve in the office of United States Representative for more than three terms, but upon ratification of this amendment no person who has held the office of the United States Representative or who then holds the office shall serve for more than two additional terms.

"(b) No person shall serve in the office of United States Senator for more than two terms, but upon ratification of this amendment no person who has held the office of United States Senator or who then holds the office shall serve in the office for more than one additional term.

"(c) Any state may enact by state constitutional amendment longer or shorter limits than those specified in section 'a' or 'b' herein.

"(d) This article shall have no time limit within which it must be ratified to become operative upon the ratification of the legislatures of three-fourths of the several States."

[3] Section 17(2) provides that the statement shall be printed

"adjacent to the name of any United States Senator or Representative who:

"(a) fails to vote in favor of the proposed Congressional Term Limits Amendment set forth above when brought to a vote or;

"(b) fails to second the proposed Congressional Term Limits Amendment set forth above if it lacks for a second before any proceeding of the legislative body or;

"(c) fails to propose or otherwise bring to a vote of the full legislative body the proposed Congressional Term Limits Amendment set forth above if it otherwise lacks a legislator who so proposes or brings to a

CLINED TO PLEDGE TO SUPPORT TERM LIMITS" be printed on all primary and general election ballots next to the name of every nonincumbent congressional candidate who refuses to take a "Term Limit" pledge that commits the candidate, if elected, to performing the legislative acts enumerated in § 17.[4] And § 19 directs the Missouri Secretary of State to determine and declare, pursuant to §§ 17 and 18, whether either statement should be printed alongside the name of each candidate for Congress.[5]

---

vote of the full legislative body the proposed Congressional Term Limits Amendment set forth above or;

"(d) fails to vote in favor of all votes bringing the proposed Congressional Term Limits Amendment set forth above before any committee or subcommittee of the respective house upon which he or she serves or;

"(e) fails to reject any attempt to delay, table or otherwise prevent a vote by the full legislative body of the proposed Congressional Term Limits Amendment set forth above or;

"(f) fails to vote against any proposed constitutional amendment that would establish longer term limits than those in the proposed Congressional Term Limits Amendment set forth above regardless of any other actions in support of the proposed Congressional Term Limits Amendment set forth above or;

"(g) sponsors or cosponsors any proposed constitutional amendment or law that would increase term limits beyond those in the proposed Congressional Term Limits Amendment set forth above or;

"(h) fails to ensure that all votes on Congressional Term Limits are recorded and made available to the public."

[4] The pledge, contained in § 18(3), reads:

"I support term limits and pledge to use all my legislative powers to enact the proposed Constitutional Amendment set forth in the Term Limits Act of 1996. If elected, I pledge to vote in such a way that the designation 'DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS' will not appear adjacent to my name."

[5] Section 19(5) permits a voter to appeal to the Missouri Supreme Court a determination that a statement should not be placed next to a candidate's name, and § 19(6) allows a candidate to appeal to the State's highest court a determination that such a statement should be printed. In either case, clear and convincing evidence is required to demonstrate that the statement does not belong on the ballot adjacent to the candidate's name.

The remainder of Article VIII provides for automatic repeal of the Article should the specified Congressional Term Limits Amendment be rati-

Respondent Don Gralike was a nonincumbent candidate for election in 1998 to the United States House of Representatives from Missouri's Third Congressional District. A month after Article VIII was amended, Gralike brought suit[6] in the United States District Court for the Western District of Missouri to enjoin petitioner, the Secretary of State of Missouri, from implementing the Article, which the complaint alleges violates several provisions of the Federal Constitution.

The District Court decided the case on the pleadings, granting Gralike's motion for summary judgment. The court first held that Article VIII contravened the Qualifications Clauses of Article I of the Federal Constitution because it "has the sole purpose of creating additional qualifications for Congress indirectly and has the likely effect of handicapping a class of candidates for Congress." 996 F. Supp. 917, 920 (1998); see 996 F. Supp. 901, 905–909 (1998). The court further held that Article VIII places an impermissible burden on the candidates' First Amendment right to speak freely on the issue of term limits by "punish[ing] candidates for speaking out against term limits" through putting "negative words next to their names on the ballot," and by "us[ing] the threat of being disadvantaged in the election to coerce candidates into taking a position on the term limits issue." 996 F. Supp., at 910; see 996 F. Supp., at 920. Lastly, the court found Article VIII to be an indirect and unconstitutional attempt by the people of Missouri to interject themselves into the amending process authorized by Article V of the Federal Constitution. In doing so, the court endorsed the reasoning of other decisions invalidating provisions simi-

---

fied, § 20; exclusive jurisdiction of challenges to the Amendment in the Supreme Court of Missouri, § 21; and severance of "any portion, clause, or phrase" of Article VIII that is declared invalid, § 22.

[6] Although Gralike intended to run for Congress when he filed suit, under Missouri law he could not formally file a declaration for candidacy until February 1998. App. 25–26.

lar to Article VIII on the ground that negative ballot designations "place an undue influence on the legislator to vote in favor of term limits rather than exercise his or her own independent judgment as is contemplated by Article V." 996 F. Supp., at 916; see 996 F. Supp., at 920.[7] Accordingly, the court permanently enjoined petitioner from enforcing §§ 15 through 19 of Article VIII.

The United States Court of Appeals for the Eighth Circuit affirmed.[8] Like the District Court, it found that Article VIII "threatens a penalty that is serious enough to compel candidates to speak—the potential political damage of the ballot labels"; "seeks to impose an additional qualification for candidacy for Congress and does so in a manner which is highly likely to handicap term limit opponents and other labeled candidates"; and "coerce[s] legislators into proposing or ratifying a particular constitutional amendment" in violation of Article V. 191 F. 3d 911, 918, 924, 925 (1999). The Court of Appeals also observed that, contrary to the Speech or Debate Clause in Art. I, § 6, cl. 1, of the Federal Constitution, Article VIII "establishes a régime in which a state officer—the secretary of state—is permitted to judge and punish Members of Congress for their legislative actions or positions." 191 F. 3d, at 922.[9]

---

[7] See *League of Women Voters of Me.* v. *Gwadosky,* 966 F. Supp. 52 (Me. 1997); *Donovan* v. *Priest,* 326 Ark. 353, 931 S. W. 2d 119 (1996).

[8] While the appeal was pending, respondent Gralike withdrew from the 1998 election and respondent Harmon, a nonincumbent candidate in the 2000 Republican congressional primary in the Seventh District of Missouri, intervened as an appellee. In view of Harmon's participation, there is no contention that this case is moot. See *Storer* v. *Brown,* 415 U. S. 724, 737, n. 8 (1974).

[9] Although Judge Hansen, dissenting in part, thought that §§ 17 through 19 should be severed, leaving the rest of Article VIII intact, the majority declined to do so. 191 F. 3d, at 926, n. 12. Petitioner does not contend here that any parts of Article VIII should be severed if found unconstitutional, but rather urges us to uphold the provision "in its entirety." Reply Brief for Petitioner 1–2.

Although the Court of Appeals' decision is consistent with the views of other courts that have passed on similar voter initiatives,[10] the importance of the case prompted our grant of certiorari. 529 U. S. 1065 (2000).

## II

Article VIII furthers the State's interest in adding a term limits amendment to the Federal Constitution in two ways. It encourages Missouri's congressional delegation to support such an amendment in order to avoid an unfavorable ballot designation when running for reelection. And it encourages the election of representatives who favor such an amendment. Petitioner argues that Article VIII is an exercise of the "right of the people to instruct" their representatives reserved by the Tenth Amendment,[11] and that it is a permissible regulation of the "manner" of electing federal legislators within the authority delegated to the States by the Elections Clause, Art. I, §4, cl. 1.[12] Because these two arguments rely on different sources of state power, it is

[10] See *Miller* v. *Moore*, 169 F. 3d 1119 (CA8 1999) (Nebraska initiative invalidated on Article V and right-to-vote grounds); *Barker* v. *Hazeltine*, 3 F. Supp. 2d 1088 (SD 1998) (South Dakota initiative invalidated on Article V, First Amendment, Speech or Debate Clause, and due process grounds); *League of Women Voters of Me.* v. *Gwadosky*, 966 F. Supp. 52 (Me. 1997) (Maine initiative invalidated on Article V grounds); *Bramberg* v. *Jones*, 20 Cal. 4th 1045, 978 P. 2d 1240 (1999) (California initiative invalidated on Article V grounds); *Morrissey* v. *State*, 951 P. 2d 911 (Colo. 1998) (Colorado initiative invalidated on Article V and Guarantee Clause grounds); *Simpson* v. *Cenarrusa*, 130 Idaho 609, 944 P. 2d 1372 (1997) (Idaho initiative invalidated on Speech or Debate Clause and state constitutional grounds, but did not violate Article V); *Donovan* v. *Priest*, 326 Ark. 353, 931 S. W. 2d 119 (1996) (in preelection challenge, Arkansas initiative invalidated on Article V grounds); *In re Initiative Petition No. 364*, 930 P. 2d 186 (Okla. 1996) (Oklahoma initiative invalidated on Article V and state constitutional grounds).

[11] Brief for Petitioner 25, and n. 37; see Reply Brief for Petitioner 4.

[12] Brief for Petitioner 28, 38; Reply Brief for Petitioner 4, 8.

appropriate at the outset to review the distinction in kind between powers reserved to the States and those delegated to the States by the Constitution.

As we discussed at length in *U. S. Term Limits,* the Constitution "draws a basic distinction between the powers of the newly created Federal Government and the powers retained by the pre-existing sovereign States." 514 U. S., at 801. On the one hand, in the words of Chief Justice Marshall, "it was neither necessary nor proper to define the powers retained by the States. These powers proceed, not from the people of America, but from the people of the several States; and remain, after the adoption of the constitution, what they were before, except so far as they may be abridged by that instrument." *Sturges* v. *Crowninshield,* 4 Wheat. 122, 193 (1819). The text of the Tenth Amendment delineates this principle:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

On the other hand, as Justice Story observed, "the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution did not delegate to them." 1 Commentaries on the Constitution of the United States §627 (3d ed. 1858) (hereinafter Story). Simply put, "[n]o state can say, that it has reserved, what it never possessed." *Ibid.*

### III*

To be persuasive, petitioner's argument that Article VIII is a valid exercise of the State's reserved power to give binding instructions to its representatives would have to overcome three hurdles. First, the historical precedents on

---

*JUSTICE SOUTER does not join this Part of the Court's opinion.

which she relies for the proposition that the States have such a reserved power are distinguishable. Second, there is countervailing historical evidence. Third, and of decisive significance, the means employed to issue the instructions, ballots for congressional elections, are unacceptable unless Article VIII is a permissible exercise of the State's power to regulate the manner of holding elections for Senators and Representatives. Only a brief comment on the first two points is necessary.

Petitioner relies heavily on the part instructions played in the Second Continental Congress, the Constitutional Convention, the early Congress, the selection of United States Senators before the passage of the Seventeenth Amendment, and the ratification of certain federal constitutional amendments.[13] However, unlike Article VIII, none of petitioner's examples was coupled with an express legal sanction for disobedience.[14] At best, as an *amicus curiae* for petitioner points out, and as petitioner herself acknowledges, such historical instructions at one point in the early Republic may have had "de facto binding force" because it might have been "political suicide" not to follow them.[15] This evidence falls short of demonstrating that either the people or the States

---

[13] Brief for Petitioner 10–17.

[14] For example, the Provincial Congress of North Carolina passed the following instruction on April 12, 1776: "*Resolved*, That the Delegates for this Colony in the Continental Congress be empowered to concur with the Delegates of the other Colonies in declaring Independency, and forming foreign alliances, reserving to this Colony the sole and exclusive right of forming a Constitution and Laws for this Colony . . . ." 5 American Archives 860 (P. Force ed. 1844).

[15] Brief for Professor Kris W. Kobach as *Amicus Curiae* 5, 13; see Brief for Petitioner 14, n. 13. But see 1 Annals of Cong. 744 (1789) (remarks of Rep. Wadsworth) ("I have known, myself, that [instructions] have been disobeyed, and yet the representative was not brought to account for it; on the contrary, he was caressed and re-elected, while those who have obeyed them, contrary to their private sentiments, have ever after been despised for it").

had a right to give legally binding, *i. e.*, nonadvisory, instructions to their representatives that the Tenth Amendment reserved, much less that such a right would apply to federal representatives. See *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S., at 802 (Tenth Amendment "could only 'reserve' that which existed before"); cf. *McCulloch* v. *Maryland*, 4 Wheat. 316, 430 (1819) (rejecting argument that States had reserved power to tax corporations chartered by Congress because an "original right to tax" such federal entities "never existed").

Indeed, contrary evidence is provided by the fact that the First Congress rejected a proposal to insert a right of the people "to instruct their representatives" into what would become the First Amendment. 1 Annals of Cong. 732 (1789). The fact that the proposal was made suggests that its proponents thought it necessary, and the fact that it was rejected by a vote of 41 to 10, *id.*, at 747, suggests that we should give weight to the views of those who opposed the proposal. It was their view that binding instructions would undermine an essential attribute of Congress by eviscerating the deliberative nature of that National Assembly. See, *e. g.*, *id.*, at 735 (remarks of Rep. Sherman) ("[W]hen the people have chosen a representative, it is his duty to meet others from the different parts of the Union, and consult, and agree with them to such acts as are for the general benefit of the whole community. If they were to be guided by instructions, there would be no use in deliberation; all that a man would have to do, would be to produce his instructions, and lay them on the table, and let them speak for him"). As a result, James Madison, then a Representative from Virginia, concluded that a right to issue binding instructions would "run the risk of losing the whole system." *Id.*, at 739; see also *id.*, at 735 (remarks of Rep. Clymer) (proposed right to give binding instructions was "a most dangerous principle, utterly destructive of all ideas of an independent and deliber-

ative body, which are essential requisites in the Legislatures of free Governments").[16]

In any event, even assuming the existence of the reserved right that petitioner asserts (and that Article VIII falls within its ambit), the question remains whether the State may use ballots for congressional elections as a means of giving its instructions binding force.

## IV

The federal offices at stake "aris[e] from the Constitution itself." *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S., at 805. Because any state authority to regulate election to those offices could not precede their very creation by the Constitution, such power "had to be delegated to, rather than reserved by, the States." *Id.,* at 804. Cf. 1 Story § 627 ("It is no original prerogative of state power to appoint a representative, a senator, or president for the union"). Through the Elections Clause, the Constitution delegated to the States the power to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to a grant of authority to Congress to "make or alter such Regulations." Art. I, § 4, cl. 1; see *United States* v. *Classic,* 313 U. S. 299, 315 (1941). No other constitutional

---

[16] Of course, whether the members of a representative assembly should be bound by the views of their constituents, or by their own judgment, is a matter that has been the subject of debate since even before the Federal Union was established. For instance, in his classic speech to the electors of Bristol, Edmund Burke set forth the latter view:

"To deliver an opinion is the right of all men; that of constituents is a weighty and respectable opinion, which a representative ought always to rejoice to hear; and which he ought always most seriously to consider. But authoritative instructions; mandates issued, which the member is bound blindly and implicitly to obey, to vote, and to argue for, though contrary to the clearest conviction of his judgment and conscience, these are things utterly unknown to the laws of this land, and which arise from a fundamental mistake of the whole order and tenor of our constitution." The Speeches of the Right Hon. Edmund Burke 130 (J. Burke ed. 1867).

provision gives the States authority over congressional elections, and no such authority could be reserved under the Tenth Amendment. By process of elimination, the States may regulate the incidents of such elections, including balloting, only within the exclusive delegation of power under the Elections Clause.

With respect to the Elections Clause, petitioner argues that Article VIII "merely regulates the manner in which elections are held by disclosing information about congressional candidates." [17] As such, petitioner concludes, Article VIII is a valid exercise of Missouri's delegated power.

We disagree. To be sure, the Elections Clause grants to the States "broad power" to prescribe the procedural mechanisms for holding congressional elections. *Tashjian* v. *Republican Party of Conn.*, 479 U. S. 208, 217 (1986); see also *Smiley* v. *Holm*, 285 U. S. 355, 366 (1932) ("It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections"). Nevertheless, Article VIII falls outside of that grant of authority. As we made clear in *U. S. Term Limits*, "the Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." 514 U. S., at 833–834. Article VIII is not a procedural regulation. It does not regulate the time of elections; it does not regulate the place of elections; nor, we believe, does it regulate the manner of elections.[18] As to the last point, Article VIII bears no relation to the "manner" of elections as we understand it, for in our commonsense view that term encompasses matters like "notices, registration, supervision of voting, protection of voters, prevention of fraud and cor-

---

[17] Brief for Petitioner 28; see also *id.*, at 38.

[18] Petitioner once shared our belief, when, in deposition testimony before the District Court, she admitted that Article VIII does not regulate the time, place, or manner of elections. App. 58.

rupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley*, 285 U. S., at 366; see also *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S., at 833. In short, Article VIII is not among "the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved," *Smiley*, 285 U. S., at 366, ensuring that elections are "fair and honest," and that "some sort of order, rather than chaos, is to accompany the democratic process," *Storer* v. *Brown*, 415 U. S. 724, 730 (1974).

Rather, Article VIII is plainly designed to favor candidates who are willing to support the particular form of a term limits amendment set forth in its text and to disfavor those who either oppose term limits entirely or would prefer a different proposal. Cf. *Anderson* v. *Celebrezze*, 460 U. S. 780, 788, n. 9 (1983) ("We have upheld generally applicable and evenhanded [ballot access] restrictions that protect the integrity and reliability of the electoral process itself"). As noted, the state provision does not just "instruct" each member of Missouri's congressional delegation to promote in certain ways the passage of the specified term limits amendment. It also attaches a concrete consequence to noncompliance—the printing of the statement "DISREGARDED VOTERS' INSTRUCTIONS ON TERM LIMITS" by the candidate's name on all primary and general election ballots. Likewise, a nonincumbent candidate who does not pledge to follow the instruction receives the ballot designation "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS."

In describing the two labels, the courts below have employed terms such as "pejorative," "negative," "derogatory," " 'intentionally intimidating,' " "particularly harmful," "politically damaging," "a serious sanction," "a penalty," and "official denunciation." 191 F. 3d, at 918, 919, 922, 925; 996 F. Supp., at 908; see *id.*, at 910, 916. The general counsel to

petitioner's office, no less, has denominated the labels as "the Scarlet Letter." App. 34–35. We agree with the sense of these descriptions. They convey the substantial political risk the ballot labels impose on current and prospective congressional members who, for one reason or another, fail to comply with the conditions set forth in Article VIII for passing its term limits amendment. Although petitioner now claims that the labels "merely" inform Missouri voters about a candidate's compliance with Article VIII, she has acknowledged under oath that the ballot designations would handicap candidates for the United States Congress. *Id.*, at 66. To us, that is exactly the intended effect of Article VIII.

Indeed, it seems clear that the adverse labels handicap candidates "at the most crucial stage in the election process—the instant before the vote is cast." *Anderson* v. *Martin*, 375 U. S. 399, 402 (1964). At the same time, "by directing the citizen's attention to the single consideration" of the candidates' fidelity to term limits, the labels imply that the issue "is an important—perhaps paramount—consideration in the citizen's choice, which may decisively influence the citizen to cast his ballot" against candidates branded as unfaithful. *Ibid.* While the precise damage the labels may exact on candidates is disputed between the parties, the labels surely place their targets at a political disadvantage to unmarked candidates for congressional office.[19] Thus, far from

---

[19] That much, apparently, also seemed clear to many Members of Congress operating under Article VIII or similar label laws adopted by other States, who consequently tailored their behavior to avoid the ballot designations. For example, in 1997, the House of Representatives voted on 11 different proposals to adopt a term limits amendment to the Constitution; 7 of those proposals were dictated by voter initiatives in 7 different States. Representative Blunt of Missouri introduced the Article VIII version to "ensure that members of the Missouri delegation have the ability to vote for language that meets a verbatim test of [the] Missouri Amendment" and thereby avoid "the scarlet letter provision." 143 Cong. Rec. H494 (Feb. 12, 1997). However, because each of the state initiatives provided

regulating the procedural mechanisms of elections, Article VIII attempts to "dictate electoral outcomes." *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S., at 833–834. Such "regulation" of congressional elections simply is not authorized by the Elections Clause.[20]

a sanction similar to the ballot labels included in Article VIII, some Representatives explained that they were constrained to vote only for the version endorsed by the voters of their States, and to vote against differing versions proposed by congressional members from other States, even though they were supportive of term limits generally. See, *e. g., id.,* at H486 (remarks of Rep. Hutchinson) ("I will vote against the bill of the gentleman from Florida [Mr. McCollum], not because I am opposed to term limits but because this particular resolution does not comply with the term limit instructions approved by the voters and the people of Arkansas"); *id.,* at H490 (remarks of Rep. Crapo) ("Last Congress I supported the McCollum term limits bill that, as I said, supported a 12-year term limit. However, in this Congress I must oppose this bill because of the initiative passed by the people of the State of Idaho which requires me to oppose any term limits measure that does not have the same set of term limit conditions that are included in the initiative that was passed in the State"). As Representative Frank of Massachusetts put it, "[e]very State's Members get to vote on their State's term limits so they make them feel better and they do not get the scarlet letter." *Id.,* at H487. Consequently, the most popular proposal for such an amendment, that of Representative McCollum of Florida, received 217 votes, 10 fewer than it had in the preceding Congress. *Id.,* at H511. As for the Missouri version, it suffered a 353-to-72 defeat. *Id.,* at H497.

[20] At the margins, the parties have fought over whether the Elections Clause is even applicable because it is a grant of power to "each State by the Legislature thereof" and Article VIII is the product of referendum. Compare Brief for Petitioner 38, n. 46, with Brief for Respondents 12–13, n. 8. Of course, "[w]herever the term 'legislature' is used in the Constitution, it is necessary to consider the nature of the particular action in view." *Smiley* v. *Holm,* 285 U. S. 355, 366 (1932). Nevertheless, we need not delve into this inquiry, as it is clear, for the reasons stated in the text, that Article VIII is not authorized by the Elections Clause.

In discussing the Elections Clause issue, respondents have also relied in part on First Amendment cases upholding "time, place, and manner" regulations of speech. Brief for Respondents 13–14. Although the Elections Clause uses the same phrase as that branch of our First Amendment

Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

I join the opinion of the Court, holding § 15 *et seq.* of Article VIII of the Missouri Constitution violative of the Constitution of the United States. It seems appropriate, however, to add these brief observations with respect to Part III of the opinion. The Court does not say the States are disabled from requesting specific action from Congress or from expressing their concerns to it. As the Court holds, however, the mechanism the State seeks to employ here goes well beyond this prerogative.

. A State is not permitted to interpose itself between the people and their National Government as it seeks to do here. Whether a State's concern is with the proposed enactment of a constitutional amendment or an ordinary federal statute it simply lacks the power to impose any conditions on the election of Senators and Representatives, save neutral provisions as to the time, place, and manner of elections pursuant to Article I, § 4. As the Court observed in *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779 (1995), the Elections Clause is a "grant of authority to issue procedural regulations," and not "a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Id.,* at 833–834. The Elections Clause thus delegates but limited power over federal elections to the States. *Id.,* at 804. The Court rules, as it must, that the amendments to Article VIII of the Missouri Constitution do not regulate the time or place of federal elections; rather, those provisions are an attempt to control the actions of the State's congressional delegation.

---

jurisprudence, it by no means follows that such cases have any relevance to our disposition of this case.

The dispositive principle in this case is fundamental to the Constitution, to the idea of federalism, and to the theory of representative government. The principle is that Senators and Representatives in the National Government are responsible to the people who elect them, not to the States in which they reside. The Constitution was ratified by Conventions in the several States, not by the States themselves, U. S. Const., Art. VII, a historical fact and a constitutional imperative which underscore the proposition that the Constitution was ordained and established by the people of the United States. U. S. Const., preamble. The idea of federalism is that a National Legislature enacts laws which bind the people as individuals, not as citizens of a State; and, it follows, freedom is most secure if the people themselves, not the States as intermediaries, hold their federal legislators to account for the conduct of their office. If state enactments were allowed to condition or control certain actions of federal legislators, accountability would be blurred, with the legislators having the excuse of saying that they did not act in the exercise of their best judgment but simply in conformance with a state mandate. As noted in the concurring opinion in *Thornton,* "[n]othing in the Constitution or The Federalist Papers . . . supports the idea of state interference with the most basic relation between the National Government and its citizens, the selection of legislative representatives." 514 U. S., at 842. Yet that is just what Missouri seeks to do through its law—to wield the power granted to it by the Elections Clause to handicap those who seek federal office by affixing pejorative labels next to their names on the ballot if they do not pledge to support the State's preferred position on a certain issue. Neither the design of the Constitution nor sound principles of representative government are consistent with the right or power of a State to interfere with the direct line of accountability between the National Legislature and the people who elect it. For these reasons Article VIII is void.

This said, it must be noted that when the Constitution was enacted, respectful petitions to legislators were an accepted mode of urging legislative action. See W. Miller, Arguing About Slavery 105–107 (1995). This right is preserved to individuals (the people) in the First Amendment. Even if a State, as an entity, is not itself protected by the Petition Clause, there is no principle prohibiting a state legislature from following a parallel course and by a memorial resolution requesting the Congress of the United States to pay heed to certain state concerns. From the earliest days of our Republic to the present time, States have done so in the context of federal legislation. See, *e. g.,* 22 Annals of Cong. 153–154 (1811) (reprinting a resolution by the General Assembly of the Commonwealth of Pennsylvania requesting that the charter of the Bank of the United States not be renewed); 2000 Ala. Acts 66 (requesting targeted relief for Medicare cuts); 2000 Kan. Sess. Laws, ch. 186 (urging Congress to allow state-inspected meat to be shipped in interstate commerce). Indeed, the situation was even more complex in the early days of our Nation, when Senators were appointed by state legislatures rather than directly elected. At that time, it appears that some state legislatures followed a practice of instructing the Senators whom they had appointed to pass legislation, while only requesting that the Representatives, who had been elected by the people, do so. See 22 Annals of Cong., at 153–154. I do not believe that the situation should be any different with respect to a proposed constitutional amendment, and indeed history bears this out. See, *e. g.,* 13 Annals of Cong. 95–96 (1803) (reprinting a resolution from the State of Vermont and the Commonwealth of Massachusetts requesting that Congress propose to the legislatures of the States a constitutional amendment akin to the Twelfth Amendment). The fact that the Members of the First Congress decided not to codify a right to instruct legislative representatives does not, in my view, prove that they

intended to prohibit nonbinding petitions or memorials by the State as an entity.

If there are to be cases in which a close question exists regarding whether the State has exceeded its constitutional authority in attempting to influence congressional action, this case is not one of them. In today's case the question is not close. Here the State attempts to intrude upon the relationship between the people and their congressional delegates by seeking to control or confine the discretion of those delegates, and the interference is not permissible.

With these observations, I concur in the Court's opinion.

JUSTICE THOMAS, concurring in Parts I and IV and concurring in the judgment.

I continue to believe that, because they possess "reserved" powers, "the people of the States need not point to any affirmative grant of power in the Constitution in order to prescribe qualifications for their representatives in Congress, or to authorize their elected state legislators to do so." *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779, 846 (1995) (THOMAS, J., dissenting). For this reason, I disagree with the Court's premise, derived from *U. S. Term Limits,* that the States have no authority to regulate congressional elections except for the authority that the Constitution expressly delegates to them. See *ante,* at 522. Nonetheless, the parties conceded the validity of this premise, see Brief for Petitioner 25–26; Brief for Respondents 12–13, and I therefore concur.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

I would affirm the judgment of the Court of Appeals, but on the ground that Missouri's Article VIII violates the First Amendment to the United States Constitution. Specifically, I believe that Article VIII violates the First Amendment right of a political candidate, once lawfully on the ballot, to

have his name appear unaccompanied by pejorative language required by the State. Our ballot access cases based on First Amendment grounds have rarely distinguished between the rights of candidates and the rights of voters. In *Bullock* v. *Carter*, 405 U. S. 134, 143 (1972), we said: "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." And in *Anderson* v. *Celebrezze*, 460 U. S. 780, 787 (1983), we said that "voters can assert their preferences only through candidates or parties or both." Actions such as the present one challenging ballot provisions have in most instances been brought by the candidates themselves, and no one questions the standing of respondents Gralike and Harmon to raise a First Amendment challenge to such laws.*

Article I, § 4, provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . ." Missouri justifies Article VIII as a "time, place, and manner" regulation of election. Restrictions of this kind are valid "provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984). Missouri's Article VIII flunks two of these three requirements. Article VIII is not only not content neutral, but it

---

*The Court of Appeals upheld their First Amendment claim, but based its reasoning on the view that the ballot statements were "compelled speech" by the candidate, and therefore ran afoul of cases such as *Wooley* v. *Maynard*, 430 U. S. 705 (1977). I do not agree with the reasoning of the Court of Appeals. I do not believe a reasonable voter, viewing the ballot labeled as Article VIII requires, would think that the candidate in question chose to characterize himself as having "disregarded voters' instructions" or as "having declined to pledge" to support term limits.

actually discriminates on the basis of viewpoint because only those candidates who fail to conform to the State's position receive derogatory labels. The result is that the State injects itself into the election process at an absolutely critical point—the composition of the ballot, which is the last thing the voter sees before he makes his choice—and does so in a way that is not neutral as to issues or candidates. The candidates who are thus singled out have no means of replying to their designation which would be equally effective with the voter.

In *Anderson* v. *Martin,* 375 U. S. 399 (1964), we held that a Louisiana statute requiring the designation of a candidate's race on the ballot violated the Equal Protection Clause. In describing the effect of such a designation, the Court said: "[B]y directing the citizen's attention to the single consideration of race or color, the State indicates that a candidate's race or color is an important—perhaps paramount—consideration in the citizen's choice, which may decisively influence the citizen to cast his ballot along racial lines." *Id.,* at 402. So, too, here the State has chosen one and only one issue to comment on the position of the candidates. During the campaign, they may debate tax reform, Social Security, national security, and a host of other issues; but when it comes to the ballot on which one or the other of them is chosen, the State is saying that the issue of term limits is paramount. Although uttered in a different context, what we said in *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972), is equally applicable here: "[Government] may not select which issues are worth discussing or debating."

If other Missouri officials feel strongly about the need for term limits, they are free to urge rejection of candidates who do not share their view and refuse to "take the pledge." Such candidates are able to respond to that sort of speech with speech of their own. But the State itself may not skew the ballot listings in this way without violating the First Amendment.