[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 02-10670
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 5, 2002
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-01335-CV-JOF-1

MICHAEL CARTWRIGHT,
GARY HOLDER, et al.,

                                  Plaintiffs-Appellants,

versus

ROY BARNES,
Governor of the State of Georgia,
CATHY COX,
Secretary of State of the State of Georgia,

                                  Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____
**(September 5, 2002)**

Before HULL, FAY and GIBSON*, Circuit Judges.

PER CURIAM:

The Appellants are the Libertarian Party of Georgia, members of the

_____

*Honorable John R. Gibson, U.S. Circuit Judge for the Eighth Circuit, sitting by
designation.

Libertarian Party who want to run for election to the United States House of Representatives in several Georgia districts, and voters from these districts who intend to vote for the Libertarian Party candidates. The Appellants challenge Georgia's requirement in O.C.G.A. § 21-2-170(b) (Supp. 2002) that a candidate from a political body may appear on an election ballot if the candidate obtains signatures in a nominating petition from at least 5% of the registered voters.[1] The main issue in this case is whether this 5% signature requirement creates a new qualification for holding federal office in violation of the Qualifications Clause of the United States Constitution.

After review and oral argument, we agree with the district court that Georgia's 5% signature requirement in § 21-2-170(b) merely regulates the manner of holding elections and does not impose on candidates, or constitute, a qualification for office in violation of the Qualifications Clause. As the district court aptly found, the signature requirement "imposes no substantive qualification on a class of potential candidates for office; rather, it merely requires that the potential candidate demonstrate a substantial basis of support" from the community. We also conclude that this 5% signature requirement does not violate

---

[1]The Appellants appeal the district court's dismissal of their claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can be granted.

any other constitutional provision.

## I. DISCUSSION

## A. Georgia Election Law

Under Georgia law, a political party is any political organization whose candidate received 20% of the vote cast in the state in the immediately preceding Gubernatorial or Presidential election. O.C.G.A. § 21-2-2(25). A candidate may appear on the election ballot if he or she is nominated in a primary conducted by a political party. O.C.G.A. § 21-2-130(1) (Supp. 2002).

However, the name of an independent candidate or a candidate of a political body may appear on the election ballot if he or she submits a nomination petition signed by a specified percentage of voters depending on the type of election being conducted. O.C.G.A. §§ 21-2-170(a) & (b) (Supp. 2002). The Libertarian Party of Georgia concedes that it is classified as a political body for purposes of O.C.G.A. § 21-2-2(23), which means that it is any political organization other than a political party. Where a candidate of a political body is seeking statewide public office, the petition must be signed by a number of voters equal to 1% of the total number of registered voters that were eligible to vote in the last election for such office. O.C.G.A. § 21-2-170(b) (Supp. 2002) & § 21-2-180. Where, as here, the candidate of a political body is seeking federal office (or any non-statewide office), the

3

petition must be signed by a number of voters equal to 5% of the total number of registered voters eligible to vote in the last election for such office. O.C.G.A. § 21-2-170(b) (Supp. 2002). Specifically, § 21-2-170(b) provides that:

> [a] nomination petition of a candidate for any [non-statewide] office shall be signed by a number of voters equal to 5 percent of the total number of registered voters eligible to vote in the last election for the filling of the office the candidate is seeking and the signers of such petition shall be registered and eligible to vote in the election at which such candidate seeks to be elected.

O.C.G.A. § 21-2-170(b) (Supp. 2002). It is this 5% requirement that Appellants challenge in this case.

Appellants do not challenge the 1% requirement for statewide elections, which requires them to obtain approximately 39,000 signatures.[2] Instead, Appellants challenge only the 5% requirement for congressional offices, which their complaint alleges requires them to collect approximately 14,846 valid and verifiable signatures of elections in a single Congressional district. Appellants' complaint asserts that no Libertarian Party candidate has ever been able to petition for ballot access in a Congressional race since 1943.[3]

---

[2]The 39,000 figure is based upon the total number of registered eligible voters in 1998, which was the year of the "last election for the filling of [statewide] office[s]." O.C.G.A. § 21-2-170 (Supp. 2002).

[3]The Appellees dispute and refute this allegation, but in our Rule 12(b)(6) posture, we must assume these allegations to be true.

## B.  Jenness v. Fortson

In support of their challenges to this requirement, Appellants first acknowledge the decision in Jenness v. Fortson, 403 U.S. 431 (1971), where the United States Supreme Court rejected a constitutional challenge to the same Georgia law over thirty years ago.  In Jenness, the Supreme Court stated that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest . . . in avoiding confusion, deception, and even frustration of the democratic process at the general election." Id. at 442.  The Supreme Court compared Georgia's 5% signature requirement with the Ohio election law struck down in Williams v. Rhodes, 393 U.S. 23 (1968).  The Ohio law barred write-in voting, required nominees to be endorsed by a political party established enough to participate in the state primary, and created a 15% signature requirement that candidates were required to fulfill "unreasonably early." Jenness, 403 U.S. at 436-38.  In comparison, Georgia's 5% signature requirement, in the context of the "open quality of the Georgia system," was not unconstitutional.  Id. at 439-40.

After acknowledging Jenness, the Appellants argue in this case that

5

Georgia's new notarization requirement and its new congressional districts have changed the Georgia system so much that Jenness no longer applies. We disagree. In upholding the validity of the Georgia system over thirty years ago in Jenness, the Supreme Court noted that "Georgia impose[d] no suffocating restrictions whatever upon the free circulation of nominating petitions." Id. at 438. The Supreme Court observed that under the Georgia system:

> A voter may sign a petition even though he has signed others, and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary. The signer of a petition is not required to state that he intends to vote for that candidate at the election. A person who has previously voted in a party primary is fully eligible to sign a petition, and so, on the other hand is a person who was not even registered at the time of a previous election.

Id. at 438-39 (citations omitted). The Supreme Court also noted that "[n]o signature on a nominating petition need be notarized" under the Georgia system. Id. at 439.

Under the current Georgia system, it is still true that no signature on a nominating petition need be notarized. The new notarization requirement to which the Appellants referred provides that an individual circulating a petition sheet submit a sworn affidavit before a notary public attesting that, among other things, "each signer manually signed his or her own name with full knowledge of the contents of the nomination petition." O.C.G.A. § 21-2-170(d)(2) (Supp. 2002).

6

The notarization requirement places no restriction upon the ability of a voter to sign a petition.

The Appellants' complaint also alleges that the 5% requirement is no longer acceptable because petitioning experience shows that voters cannot identify correctly their respective congressional districts, especially after reapportionment, thereby requiring petition circulators to acquire surplus signatures. Even accepting Appellants' allegations, we conclude that, like the notarization requirement, reapportionment has not imposed any "suffocating restrictions" upon the free circulation of nominating petitions. Reapportionment arguably may lead to some voter confusion and may place an extra burden on candidates to be sure that they have obtained the requisite 5%. Even so, this does not make the 5% requirement unduly burdensome for independent candidates. In Georgia, as Jenness notes, petition circulators have ample time to obtain signatures—about six months. 403 U.S. at 438; O.C.G.A. § 21-2-170(d)(3) (Supp. 2002). Furthermore, no harm results if a voter accidentally signs the wrong petition, as "[a] voter may sign a petition even though he has signed others." Jenness, 403 U.S. at 438-39. Also, the boundaries of the districts are known to the petition circulators who readily can ask voters where they reside and thereby ascertain if they reside in the district. In short, Appellants fail to establish that Jenness no longer applies.

7

Appellants also stress that no Libertarian Party candidate has ever been able to satisfy the 5% requirement for ballot access. But Jenness directly addressed the 5% figure, stating as follows:

> The 5% figure is, to be sure, apparently somewhat higher than the percentage of support required to be shown in many States as a condition for ballot position, but this is balanced by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes. Georgia in this case has insulated not a single potential voter from the appeal of new political voices within its borders.

Id. at 442 (citation omitted). In sum, we conclude the following analysis in Jenness still equally pertains today, to wit:

> The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

Id. at 440-41 (citation omitted).

### C. Qualifications and Elections Clauses

We recognize that Jenness was premised on the First and Fourteenth Amendments to the Constitution, not the Qualifications Clause, which is the focus of Appellants' challenge. See id. at 434. Thus, we now turn our attention to the

8

Supreme Court's decisions involving the Qualifications Clause in <u>Storer v. Brown</u>, 415 U.S. 724 (1974) and <u>U.S. Term Limits, Inc. v. Thornton</u>, 514 U.S. 779 (1995).

The Qualifications Clause provides that "[n]o Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." U.S. Const. art. I, § 2, cl. 2. States may not impose additional qualifications for election to the House of Representatives beyond those contained in the Qualifications Clause. <u>Term Limits</u>, 514 U.S. at 827.

At the same time, under the Elections Clause, States have the authority to regulate "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I., § 4, cl. 1. States may enact "numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." <u>Term Limits</u>, 514 U.S. at 834 (citation omitted). The requirement that candidates demonstrate some measure of support before their names appear on the ballot generally is viewed as a legitimate exercise of a state's authority to regulate the manner in which elections are held.

<u>Storer</u>, 415 U.S. at 746 n. 16 (1974).[4] The power to create procedural regulations does not, however, "provide States with license to exclude classes of candidates from federal office." <u>Term Limits</u>, 514 U.S. at 832-33.

The Supreme Court discussed the Qualifications and Elections Clauses at length in <u>Term Limits</u>, where it invalidated Arkansas' term-limits amendment, which barred three-term Representatives from having their names placed on the ballot. In that case, the petitioners cited <u>Storer</u> in defining a qualification as a "legal bar" to service. <u>Term Limits</u>, 514 U.S. at 828. The petitioners then argued that the Arkansas term limits amendment was not a legal bar to service because the amendment only prohibited a three-term incumbent from appearing on the ballot, but did not preclude such an incumbent from running as a write-in candidate, or serving, if elected. <u>Id.</u>

In <u>Term Limits</u>, the Supreme Court did not fashion a precise definition of

---

[4]We also reject as frivolous Appellants' claim that Georgia's 5% requirement is similar to the challenged provision in <u>Cook v. Gralike</u>, 531 U.S. 510 (2001), which involved a requirement that

> "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" be printed on all primary and general ballots adjacent to the name of a Senator or Representative who fails to take any one of eight legislative acts in support of [a term-limits amendment]. [Another section] provides that the statement "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" be printed on all primary and general election ballots next to the name of every nonincumbent congressional candidate who refuses to take a "Term Limit" pledge that commits the candidate, if elected, to performing the legislative acts [in support of the amendment].

<u>Id.</u> at 514-15.

qualification in answering the petitioners' argument.  The Supreme Court struck down the term-limits amendment using the petitioner's narrow definition of qualification.  See id. at 829 ("We need not decide whether petitioners' narrow understanding of qualifications is correct because, even if it is, [the term-limits amendment] may not stand.").  The Supreme Court reasoned that an indirect denial of constitutional rights was equivalent to a direct denial of those rights.  Id. at 829.  While the term limits amendment was not a legal bar per se, the amendment was an "indirect attempt to accomplish what the Constitution prohibits Arkansas from accomplishing directly."  Id.  The Supreme Court held that "an amendment with the avowed purpose and obvious effect of evading the requirements of the Qualifications Clauses by handicapping a class of candidates cannot stand."  Id. at 831.

When the district court dismissed the Appellants' challenge to Georgia's 5% requirement, it applied a two-part test in evaluating whether the 5% requirement violates the Qualifications Clause.  The district court first inquired whether the statute creates an absolute bar to candidates who otherwise would qualify for office.  After concluding that it did not, the district court then quoted from Term Limits and analyzed whether the statute "has the likely effect of handicapping an otherwise qualified class of candidates and has the sole purpose of creating

11

additional qualifications indirectly." Term Limits, 514 U.S. at 835-36; Schaefer v. Townsend, 215 F.3d 1031, 1035 (9th Cir. 2000) (applying the same two-part test for evaluating Qualifications Clause challenges), cert. denied sub nom Jones v. Schaefer, 121 S. Ct. 1225 (2001). As discussed above, however, the Supreme Court rejected the Arkansas term-limits amendment without "decid[ing] whether petitioners' narrow understanding of qualifications is correct." Term Limits, 514 U.S. at 829. Because Term Limits leaves open the possibility that the definition of qualification may be broader than presented by the petitioners, it is conceivable that an election provision may not violate the district court's two-part test yet still constitute a qualification prohibited by the Constitution.

We need not decide whether Term Limits provides an exhaustive definition of qualification applicable to all Qualifications Clauses challenges. Instead, Storer and Term Limits identify certain types of ballot access restrictions that are election procedures and not substantive qualifications, and we conclude that Georgia's 5% requirement is likewise an election procedure and not a substantive qualification.

For example, in Storer, the Supreme Court rejected a challenge to a California Elections Code requirement that independent candidates not be affiliated with a political party one year prior to the preceding primary. 415 U.S. at 746 n. 16. The nonaffiliation requirement was "expressive of a general state policy aimed

12

at maintaining the integrity of the various routes to the ballot." Id. at 733, 734-35

("A candidate in one party primary may not now run in that of another; if he loses in the primary he may not run as an independent."). The Supreme Court in Storer found that the argument that the California Elections Code provision was a qualification was "wholly without merit." Id. at 746 n. 16. The Supreme Court went on to say that a nonaffiliation requirement was no more an additional requirement for office than the requirement "that the candidate win the primary to secure a place on the general ballot or otherwise demonstrate substantial community support." Id. (emphasis added).

Similarly, in Term Limits, the Supreme Court observed that the California Elections Code provision in Storer was constitutional because it "regulated election procedure[] and did not even arguably impose any substantive qualification." 514 U.S. at 835; see Libertarian Party of Illinois v. Rednour, 108 F.3d 768, 777 (7th Cir. 1997) ("[W]here requirements are procedural in nature and do not add substantive qualifications, they do not violate the Qualifications Clause.") (citing Term Limits, 514 U.S. at 835). In Term Limits, the Supreme Court also pointed out that other Elections Clause cases recognized that States, under the Elections Clause, are "entitled to adopt generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." Id. at 834

13

(quoting Anderson v. Celebreeze, 460 U.S. 780, 788 n. 9 (1983)). Georgia's 5% requirement is such a provision, and does not "even arguably impose" any substantive qualification. Instead, it requires that a candidate "demonstrate substantial community support" before obtaining a place on the ballot, an interest that the Supreme Court recognized over thirty years ago when it upheld Georgia's 5% requirement. See Jenness, 403 U.S. at 442 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot . . . ."); see Libertarian Party, 108 F.3d at 777 (upholding a similar Illinois provision that a new political party meet a 5% petitioning requirement to place congressional candidate on general election ballot because the requirement "merely assure[s] that candidates meet a minimum threshold of voter support in order to maintain the integrity and regularity of the electoral process"). Therefore, we conclude that Georgia's 5% requirement is not a "qualification," but a permissible procedural regulation of the manner in which candidates may obtain ballot placement.

For these reasons, we affirm the district court's dismissal of Appellants' complaint.

**AFFIRMED.**

14