[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-13643

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 29, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00644-CV-2-MHT-SRW

JOHNNY SWANSON, III,
FRANK E. COBB,
JOE GRIMSLEY,

Plaintiffs-Appellants,

THE INDEPENDENT DEMOCRATS (ALABAMA),

Plaintiff,

versus

NANCY WORLEY,
Alabama Secretary of State,
TROY KING,
Alabama Attorney General,
NANCY O. ROBERTSON,
Probate Judge for Barbour County, Alabama,
ARTHUR C. MURRAY,
Probate Judge for Calhoun County, Alabama,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

**(June 29, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,[*] Judge.

HULL, Circuit Judge:

Plaintiffs are former independent political candidates who appeal the district court's order granting summary judgment to the state defendants on plaintiffs' constitutional challenge to Alabama's ballot access restrictions. Specifically, under Alabama law, independent candidates seeking ballot access must submit a petition with the signatures of at least three percent of qualified electors who cast ballots at the last general election for governor, and the signature petition must be filed by the first primary election date, which is the first Tuesday in June. See Ala. Code § 17-8-2.1 (2005) (current version at Ala. Code § 17-6-22); Ala. Code § 17-16-6 (2005) (current version at Ala. Code § 17-13-3). Plaintiffs contend that the three-percent signature requirement and primary election date filing deadline, independently and in combination, infringe upon their First and Fourteenth Amendment rights. After review and oral argument, we agree with the district

[*]Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

2

court that, based on the record in this case, plaintiffs have not shown a constitutional violation, and thus we affirm.

## I. BACKGROUND

**A.  2002 Election Campaign**

On April 3, 2001, plaintiff Johnny Swanson, III joined the 2002 race for United States Senator in Alabama as the candidate of his newly formed party, the Independent Democrats of Alabama.  In the early spring of 2002, plaintiff Frank Cobb began his campaign as an independent candidate for Alabama House Representative District 40, and plaintiff Joseph Grimsley began his campaign as an independent candidate for Sheriff of Barbour County.

Under Alabama law, if a political party has not garnered more than twenty percent of the votes cast at the preceding general election, that political party must petition the Alabama Secretary of State or county probate office for placement on the ballot.  See Ala. Code § 17-16-2 (2005) (current version at Ala. Code § 17-13-40); Ala. Code § 17-8-2.1(a)(1) (2005).  Prior to 1995, Alabama required that independent and minor party candidates must provide the signatures of one percent of voters with their petitions.  In 1995, Alabama adopted a requirement that petitions include "the signatures of at least three percent of the qualified electors who cast ballots for the office of Governor in the last general election for the state,

3

county, city, district, or other political subdivision in which the political party seeks to qualify candidates for office . . . ." Ala. Code § 17-8-2.1(a)(1) (2005) (emphasis added).

Under this three-percent signature requirement, plaintiff Swanson needed to gather 39,536 valid signatures in order to appear on the general election ballot in his statewide race in 2002. Plaintiffs Cobb and Grimsley needed to gather several hundred valid signatures to appear on the ballot for their local races.

Prior to 2002, independent candidates had to submit the required number of valid signatures "six days after the second primary election," which was July 1 in the 2002 election cycle. Ala. Code § 17-8-2.1 (1995). On December 28, 2001, the Alabama governor signed Act. No. 2001-1131 ("the Act"), which, inter alia, moved the deadline for independent candidate registration to the date of the first primary election. See Act of Dec. 28, 2001, 2001 Ala. Laws 1131.[1] The first primary election date in the 2002 election cycle was June 4, 2002.

On March 29, 2002, the Act was submitted to the Department of Justice for preclearance. On May 28, 2002, the Department of Justice precleared the Act, and

_____

[1]The Act also amended the "sore loser" statute by moving the filing deadline in that statute for independent candidates to the date of the first primary election. See Ala. Code § 17-7-1(a)(3) (2005) (current version at Ala. Code § 17-9-3(a)(3)). Even before this deadline change, Alabama's "sore loser" statute barred major party candidates who were defeated in a party primary election from running as independent candidates in the same election cycle. See id.; see also infra note 17.

the Alabama Secretary of State issued a press release to the general public about the registration deadline change to June 4, 2002, exactly one week after the Act went into effect.[2]

Although plaintiff Swanson first learned about the Act shortly after it was submitted for preclearance in March 2002, the Secretary of State's Office did not inform him of the new June 4 deadline until a week before the deadline. Plaintiff Grimsley learned about the new deadline as he was collecting signatures on the first primary election date on June 4, and plaintiff Cobb learned about the deadline several days after June 4.

On July 1, 2002 (i.e., the old filing deadline before the Act went into effect), Cobb and Grimsley attempted to file their registration petitions with the required number of verified signatures. By July 1, 2002, Swanson had submitted just under 11,000 signatures to be verified by the Secretary of State's Office, well short of the three-percent signature threshold even if all signatures were verified. Swanson actually would have been short even if the one-percent signature threshold had been in effect.

B.      **Preliminary Injunction Suit and Hearing**

On June 4, 2002, Swanson filed an initial complaint under 42 U.S.C. § 1983.

_____

[2]The State Election Handbook in 2002 described the Act, but noted that it was subject to Department of Justice preclearance and listed the candidate registration deadline as July 1, 2002.

On August 13, 2002, Swanson, joined by Cobb and Grimsley, filed an amended complaint against the Alabama Governor, Alabama Attorney General, Alabama Secretary of State, and Probate Judges of Barbour County and Calhoun County.[3] The amended complaint alleged that Alabama's ballot access laws violated the Qualifications Clause; the Interstate Commerce Clause; and the First, Tenth, Fourteenth, and Seventeenth Amendments. The amended complaint sought three forms of relief: (1) injunctive relief to place plaintiffs Swanson, Cobb, and Grimsley on the general election ballot; (2) injunctive relief to stop the implementation of the Act; and (3) a declaratory judgment that the three-percent signature requirement and the Act are unconstitutional.

In August 2002, the district court held a preliminary injunction hearing. Plaintiffs Swanson, Cobb, and Grimsley testified about obstacles they faced in collecting valid signatures. Cobb and Grimsley stated that they had collected a sufficient number of signatures by the first primary election date of June 4, but they did not submit their petitions until July 1 because of the late notice of the deadline change. Swanson admitted that he fell short of the three-percent signature threshold, but said that he lost volunteers willing to gather signatures after he learned about the deadline change to June 4.

---

[3]The district court later dismissed the Alabama Governor from the suit. This dismissal is not at issue on appeal.

Mark Bodenhausen of the Libertarian Party and Bob Belcher of the Reform Party testified that primary polling places are critical venues for gathering signatures and asserted that the new filing deadline–the first primary election date–would undermine ballot access efforts. Bodenhausen stated that the Libertarian Party gained general ballot access in the 2002 election cycle based on solid election results from the 2000 race, which followed a $100,000 signature-gathering campaign begun seventeen months before the 2000 election.[4]

Richard Winger, the editor of an election law newsletter, testified that polling places are the best locations to gather signatures and that the deadline change would have a "very significant effect" on independent candidates attempting to qualify for ballot access. Winger also testified that Alabama was the second toughest state for independent and minor party candidates to gain ballot access in 2002. David Gillespie, a political science professor at Presbyterian College, testified that Alabama's ballot access laws were more restrictive than many states and would not contribute to voter education.

Despite the short notice of the new June 4, 2002 filing deadline, independent candidates Jimmy Blake and Tracy Larkin testified that they met the three-percent

---

[4]As discussed later, Alabama provides unlimited time for the petitioning effort. While there is a deadline for filing the petition, there is no limitation on the start date, which is why the Libertarian Party could begin its petitioning effort seventeen months before the election.

signature requirement and qualified for ballot access in their local races in the 2002 election.[5]  Both candidates admitted that they would have had more difficulty qualifying for ballot access if they were not already well-known.

After the hearing, the district court granted a preliminary injunction in part and denied it in part on August 30, 2002.  Swanson v. Bennett, 219 F. Supp. 2d 1225, 1234 (M.D. Ala. 2002) (Swanson I).  The district court found that Alabama's three-percent signature requirement was less than the five-percent signature requirements in other states that had been upheld in two United States Supreme Court cases as not excessive and constitutional.  Id. at 1231 (citing Storer v. Brown, 415 U.S. 724, 738, 94 S. Ct. 1274, 1283 (1974); Jenness v. Fortson, 403 U.S. 431, 442, 91 S. Ct. 1970, 1976 (1971)).  The district court also noted that this Court previously had upheld Florida's three-percent signature requirement.  Id. at 1231-32 (citing Libertarian Party of Florida v. Florida, 710 F.2d 790, 793 (11th Cir. 1983)).  The district court further determined that the Alabama statute had sufficient "alleviating factors" to ease the burden of gathering signatures.  Id. at 1232.  Accordingly, in denying Swanson's request for a preliminary injunction, the district court determined that plaintiff Swanson did not have a substantial

_____

[5]Jimmy Blake qualified as an independent candidate for a county commissioner's seat in Jefferson County, and Tracy Larkin qualified as an independent candidate for Alabama State Senate District 26.

8

likelihood of success in his challenge to Alabama's three-percent signature requirement. Id.

As to plaintiffs Cobb and Grimsley, the district court noted that they had met the three-percent signature requirement and determined that they had a substantial likelihood of success on the merits of their claims that they were deprived of "fair notice" of the change in the filing deadline. Id. at 1229-31. The district court found that Cobb and Grimsley expected to have until July 1 to meet the registration deadline and were given no notice of the new date of June 4. Id. at 1230. Furthermore, the district court found that "the State has failed to articulate an adequate reason for applying the new deadline to the current election cycle instead of delaying its applicability or granting candidates such as Cobb and Grimsley a grace period for compliance." Id. Accordingly, the district court concluded that Cobb and Grimsley satisfied the requirements for a preliminary injunction and ordered defendants to place Cobb's and Grimsley's names on the general election ballot. Id. at 1234. The district court emphasized that the problem with the deadline change statute was "not its content, but the manner in which it was promulgated without sufficient notice to those affected by its terms." Id.

C. Cross-Motions for Summary Judgment

Following the 2002 election, the district court addressed the parties' cross-

motions for summary judgment.  In support of these cross-motions, plaintiffs' brief noted that defendants did not dispute any of the factual allegations in this case, and defendants' brief also observed that there were no genuine issues of material fact.

On August 24, 2004, the district court granted summary judgment to defendants in part.  Swanson v. Bennett, 340 F. Supp. 2d 1295, 1301 (M.D. Ala. 2004) (Swanson II).  The district court first noted that "[t]he facts in this case are not in dispute" and "summarize[d] the relevant facts."[6]  Id. at 1297.  The district court then addressed the fair notice claim.

After noting its preliminary injunction order and that the 2002 election cycle had passed, the district court stated that its conclusion at the summary judgment stage was now different from the preliminary injunction stage as to the fair notice claim.  Id. at 1298.  The district court determined that "the only way the same wrong could recur for Grimsley, Cobb, and Swanson would be if Alabama were to change the law regarding the registration deadline again and fail to give them notice of it again . . . ."  Id.  After finding that this scenario was unlikely to occur, the district court issued a show-cause order as to why the fair notice claim should not be dismissed as moot.  Id. at 1298-99, 1301.

---

[6]In this appeal, the parties do not challenge the district court's conclusion that the facts in this case are not in dispute.  No party claims that the case should be remanded for trial; instead, all parties agree that the appeal presents questions of law that should be resolved on summary judgment.

The district court next considered the three-percent signature requirement. The district court noted that, in its 2002 preliminary injunction order, it had already found that "the State did have an important interest in requiring independent candidates to show they had a 'significant modicum' of support before printing their names on the ballot." Id. at 1299 (quoting Swanson I, 219 F. Supp. 2d at 1231). The district court concluded that the three-percent signature requirement is reasonable based on Jenness and Libertarian Party, especially given the alleviating factors present in the Alabama statute containing the three-percent signature requirement. Id.

The district court also cited this Court's decision in Cartwright v. Barnes, 304 F.3d 1138 (11th Cir. 2002), where this Court upheld Georgia's five-percent signature requirement. Id. The district court then found that Alabama ballot access laws had sufficient alleviating factors and reiterated its earlier ruling that the signature requirement "does not unreasonably restrict or place suffocating restrictions on a candidate's ability to gather signatures."[7] Id. at 1300.

_____

[7]Specifically, the district court found that Alabama's election laws included the following alleviating factors:

> (1) allowing voters to sign the petition regardless of party affiliation; (2) allowing voters who already voted in the primary to sign the petition; (3) allowing voters to sign more than one petition; (4) lack of restriction on how many signatures were allowed from one area; (5) lack of restriction on how many signatures could be submitted in an effort to meet the 3% requirement; (6) allowing sufficient time to conduct the petitioning effort; (7) the ability of minor political parties to qualify for the ballot in the past; and (8) the cost required was not impermissibly

11

In upholding Alabama's three-percent signature requirement, the district court acknowledged that plaintiff Swanson offered the affidavit of Richard Winger, which stated that few other states imposed the restrictions that Alabama does. Id. The district court found this fact irrelevant because a court "'is no more free to impose the legislative judgment of other States on a sister State than it is free to substitute its own judgment for that of the state legislature.'" Id. (quoting Swanson I, 219 F. Supp. 2d at 1233 (quoting Libertarian Party, 710 F.2d at 794)). The district court also repeated its earlier finding that the State had an "important interest in requiring independent candidates to show they had a 'significant modicum' of support before printing their names on the ballot." Id. at 1299 (citation omitted). After concluding that Alabama's three-percent signature requirement was constitutional, the district court granted summary judgment to defendants on this claim. Id. at 1300-01.

Subsequently, on May 30, 2006, the district court granted summary judgment to defendants on plaintiffs' additional claim that the filing deadline on the primary election date impermissibly burdened signature gathering. Swanson v. Worley, 432 F. Supp. 2d 1262, 1264 (M.D. Ala. 2006) (Swanson III). The district court dismissed the "fair notice" claim as moot and noted its earlier finding that the

---

burdensome.
Swanson II, 340 F. Supp. 2d at 1299 n.3.

three-percent signature requirement was constitutional.  Id. at 1262-63.

After resolving those two claims, the district court considered whether the filing deadline–the day of the first primary election–impermissibly and unconstitutionally denied plaintiffs the opportunity to collect signatures at primary polling places, which plaintiffs asserted was "'the most viable source of successful petition drives . . . .'"  Id. at 1263.  The district court agreed with plaintiffs that the deadline on the primary election day deprived plaintiffs of a "meaningful opportunity" to gather signatures on the primary election day itself.  Id. at 1263 n.2.  The district court acknowledged that plaintiffs had given these reasons why having the primary election day to collect signatures for the three-percent signature requirement was so important:

> the mindset of electors is on election issues, petitioners are assured that the elector is a registered voter, the electors['] district and polling places are readily apparent, electors are not suspicious of the petitioners' need for personal information, it is the only public place where petitioners' activities are welcomed, and it is the least costly means of obtaining signatures.

Id. at 1263.  Therefore, in evaluating the constitutionality of the filing deadline, the district court was advised of and noted the interrelationship between the deadline change and the three-percent signature requirement and how changing the deadline to the primary election day caused plaintiffs to lose the least costly and most effective way for plaintiffs to collect signatures to meet the three-percent signature

13

requirement.

Nonetheless, the district court concluded that the deadline change to the primary election date for meeting the three-percent signature requirement was not unconstitutional because "other factors present in the Alabama election scheme alleviate . . . this perceived loss." Id. (quotation marks, internal citation, and alteration omitted). In evaluating the deadline change, the district court recited those other factors, including:

(1) "Alabama does not restrict voters from signing petitions based on their party affiliation";

(2) Alabama does not "restrict voters who have already voted in [the] primary from signing the petition";

(3) "[i]ndependent candidates can seek signatures from voters who have already signed other petitions";

(4) "there are no restrictions on how many signatures may come from a specific geographical area";

(5) "Alabama does not restrict how many signatures can be submitted in an effort to meet the 3% requirement"; and

(6) Alabama "allows unlimited time to conduct the petitioning effort."

14

Id. (quotation marks and citation omitted).  The district court then applied the balancing test and factors identified in Swanson I and concluded that "changing the deadline for independent candidates to collect signatures from six days after the second primary election to the day of the first primary election is reasonable and does not put an unreasonable burden on independent candidates." Id. (quotation marks, citation, and alteration omitted).  In reaching this conclusion, the district court relied in part on Jenness and characterized Jenness as holding that the "deadline [on the] primary election for independent candidates to meet [the five-percent] signature requirement is not 'unreasonably early.'" Id. (quoting Jenness, 403 U.S. at 438, 91 S. Ct. at 1974).

Plaintiffs timely appealed.

## II. DISCUSSION

In their brief on appeal, plaintiffs raise these two issues:

I. Is Alabama Statute § 17-7-1 requiring independent and minor party candidates to obtain signatures of three percent of the electors who cast votes for governor in the last election unconstitutional because it substantially burdens the First and Fourteenth Amendment rights of voters and candidates but fails to serve any legitimate state interest?

II. Does the Alabama Statute § 17-7-1 changing the filing deadline for the signature petitions of independent and minor party candidates to the day of the primary election, combined with a three percent signature threshold, abridge the First and Fourteenth Amendment rights of candidates and voters by denying them the only meaningful opportunity to collect signatures and meet the threshold?

15

Before addressing the merits of plaintiffs' two claims, we outline the applicable balancing test for constitutional challenges to ballot access restrictions.[8]

## A.     The Supreme Court's Balancing Test

The Supreme Court long has recognized candidates' constitutional rights under the First and Fourteenth Amendments to associate for political ends and to participate equally in the electoral process.  See Burdick v. Takushi, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992); Anderson v. Celebrezze, 460 U.S. 780, 787-88, 103 S. Ct. 1564, 1569 (1983).  Ballot access restrictions also implicate the constitutional rights of voters, especially those with preferences outside the existing parties, to associate and cast their votes effectively.  See Williams v. Rhodes, 393 U.S. 23, 30, 89 S. Ct. 5, 10 (1968).  However, the Supreme Court also "long has recognized that states have important and compelling interests in regulating the election process and in having ballot access requirements."  Green v. Mortham, 155 F.3d 1332, 1335 (11th Cir. 1998) (collecting cases).  In particular, the Supreme Court has emphasized that a state has an "important state interest in requiring some preliminary showing of a significant modicum of support before

_____

[8]The parties agree that we review a district court's grant of summary judgment de novo.  See Willard v. Fairfield S. Co., 472 F.3d 817, 821 (11th Cir. 2006).  In this appeal, no party claims that any genuine issues of material fact exist; rather, the parties throughout the litigation have agreed that the facts are undisputed and argue that the case presents questions of constitutional law subject to de novo review.

16

printing the name of a political organization's candidate on the ballot–the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."[9] Jenness, 403 U.S. at 442, 91 S. Ct. at 1976.

In order to balance these interests, a court must first consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the [candidate] seeks to vindicate." Anderson, 460 U.S. at 789, 103 S. Ct. at 1570. "It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. In making this evaluation, a court must "determine the legitimacy and strength of [the State's] interests [and] consider the extent to which those interests make it necessary to burden the [candidate's] rights." Id. A court then must weigh all these factors to determine if the statute is constitutional. Id.

Furthermore, if the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." Timmons v. Twin Cities Area New Party,

_____

[9]Alabama law provides candidates with two ways to demonstrate the required "significant modicum of support." First, a political organization can obtain general ballot access by garnering twenty percent of the votes cast at the general election for state officers. See Ala. Code § 17-16-2 (2005). Alternatively, a political organization or a candidate can obtain ballot access for a particular election by satisfying the three-percent signature threshold by the first primary election date. See Ala. Code § 17-8-2.1 (2005). Only the second path is at issue here.

520 U.S. 351, 358, 117 S. Ct. 1364, 1370 (1997).  But when a state ballot access

law provision imposes only "'reasonable, nondiscriminatory restrictions'" upon the

plaintiffs' First and Fourteenth Amendment rights, "a State's 'important regulatory

interests' will usually be enough to 'justify reasonable, nondiscriminatory

restrictions.'"  Id. (quoting Burdick, 504 U.S. at 434, 112 S. Ct. at 2063).  "Lesser

burdens . . . trigger less exacting review . . . ."  Id.

Under this framework, we first review the "character and magnitude of the

asserted injury" to plaintiffs' constitutional rights, considering the burden posed by

the signature requirement and the June filing deadline independently and in

combination.

## B.    Signature Requirement

Plaintiffs assert that Alabama's three-percent signature requirement violates

the First and Fourteenth Amendments.[10]  Based on our precedent, we conclude that

_____

[10]Defendants contend that the signature requirement claim is moot.  Although the 2002
election cycle has passed, it is well settled that ballot access challenges fall under the "capable of
repetition, yet evading review" exception to the mootness doctrine.  See Norman v. Reed, 502
U.S. 279, 287-88, 112 S. Ct. 698, 704-05 (1992); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S. Ct.
1493, 1494 (1969); Libertarian Party, 710 F.2d at 796.  While the signature requirement claim is
not moot, Cobb and Grimsley nonetheless lack standing to challenge the signature requirement.
In order to establish standing, a plaintiff must show "a fairly traceable connection between the
plaintiff's injury and the complained-of conduct of the defendant."  See Charles H. Wesley
Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 (11th Cir. 2005) (quotation marks and citation
omitted).  Because Cobb and Grimsley satisfied the signature requirement, their injury–their
omission from the ballot–was "fairly traceable" to their failure to meet the filing deadline, not
the signature requirement.  Accordingly, only Swanson has standing to challenge the three-
percent signature requirement.

Alabama's signature requirement by itself does not impose a severe burden on plaintiffs' rights but is a reasonable, nondiscriminatory restriction.

This Court previously upheld a three-percent signature requirement in a challenge under the First and Fourteenth Amendments in Libertarian Party of Florida v. Florida. In Libertarian Party, we considered the constitutionality of a Florida statute requiring the signatures of three percent of all registered voters in order for a minor party candidate to appear on the general election ballot. See id., 710 F.2d at 792. Based on Jenness, we observed that the State had compelling state interests in regulating the state's election process; in requiring a significant modicum of support before placing a candidate on a ballot; and in avoiding confusion, deception, and frustration of the democratic process. Id. at 792-93 (citing Jenness, 403 U.S. at 442, 91 S. Ct. at 1976). We rejected strict scrutiny analysis and stated that the test was whether the three-percent signature requirement was "a rational way to meet this compelling state interest." Id. at 793. We added that the test is one of "reasonableness, i.e., whether the statute unreasonably encroaches on ballot access." Id. at 793 (citing Anderson, 460 U.S. at 788 & n.9, 103 S. Ct. at 1570 & n.9). In light of the compelling state interest and several factors that eased the burden of gathering signatures, this Court concluded in Libertarian Party that Florida's three-percent signature requirement

19

was valid.  Id. at 795.

Alabama's three-percent signature requirement is less burdensome than Florida's signature requirement in Libertarian Party.  While Florida required signatures of three percent of all registered voters, Alabama requires only the signatures of three percent of qualified electors who voted in the last gubernatorial election, a significantly smaller pool than all registered voters.

Moreover, the Supreme Court has upheld even more restrictive signature requirements than Alabama's three-percent requirement.  See Am. Party of Tex. v. White, 415 U.S. 767, 788-89, 94 S. Ct. 1296, 1309-10 (1974) (upholding Texas's signature thresholds of three and five percent for local independent candidates); Storer, 415 U.S. at 740, 94 S. Ct. at 1284 (concluding that California's five-percent signature requirement was not per se unconstitutional); Jenness, 403 U.S. at 442, 91 S. Ct. at 1976 (upholding Georgia's five-percent requirement); Cartwright, 304 F.3d at 1141-42 (reaffirming Jenness in upholding Georgia's five-percent signature requirement).  Based on this long line of precedent, we must conclude that Alabama's three-percent signature requirement is a reasonable, nondiscriminatory restriction that imposes a minimal burden on plaintiffs' rights.

As the district court noted, Alabama's statute also has the same alleviating factors that eased the burden of gathering signatures in Libertarian Party.  See

<u>Swanson II</u>, 340 F. Supp. 2d at 1299 & n.3; <u>Swanson I</u>, 219 F. Supp. 2d at 1232 & n.4. Specifically, the district court found that Alabama's statute:

> does not restrict voters from signing petitions based on their party affiliation, nor does it restrict voters who have already voted in a primary from signing the petition. Independent candidates can seek signatures from voters who have already signed other petitions, and there are no restrictions on how many signatures may come from a specific geographical area. Alabama does not restrict how many signatures can be submitted in an effort to meet the 3% requirement, and <u>the state allows unlimited time to conduct the petitioning effort</u>.

<u>Swanson I</u>, 219 F. Supp. 2d at 1232 (emphasis added). Therefore, while there is a deadline for collecting signatures, there is no required start date or limited time period for collecting signatures. These alleviating factors resonate just as strongly in this case as they did in <u>Libertarian Party</u>, if not more so, and ameliorate any burden on plaintiffs' constitutional rights.[11]

The ability of minor party candidates in Alabama to qualify for the ballot in the past also bolsters the reasonableness of Alabama's three-percent signature

---

[11]The alleviating factors recognized in <u>Libertarian Party</u> included: (1) allowing voters to sign the petition regardless of party affiliation; (2) allowing voters who already voted in the primary to sign the petition; (3) allowing voters to sign more than one petition; (4) placing no geographic caps on the number of signatures that can be gathered from one area; (5) imposing no limit on how many signatures may be submitted for verification; (6) allowing sufficient time to conduct the petitioning effort; and (7) requiring no impermissibly burdensome expenses. <u>Libertarian Party</u>, 710 F.2d at 794; <u>see also</u> <u>Jenness</u>, 403 U.S. at 438-39, 91 S. Ct. at 1974.

In <u>Libertarian Party</u>, the plaintiffs had 188 days to collect signatures to meet the three-percent signature requirement. <u>Libertarian Party</u>, 710 F.2d at 794. In <u>Jenness</u>, the plaintiffs had only 180 days before the deadline to meet the five-percent signature requirement. <u>Jenness</u>, 403 U.S. at 433, 91 S. Ct. at 1972. Alabama not only has similar alleviating factors but also an additional important one in that Alabama allows an unlimited time period for the petitioning effort. <u>Swanson I</u>, 219 F. Supp. 2d at 1232.

21

requirement. Specifically, many Libertarian Party candidates met Alabama's signature requirement and qualified for ballot access in both statewide and local offices in the 2000 election. Based on strong election results in the 2000 election, the Libertarian Party gained general ballot access for the 2002 election, entitling it to nominate a slate of both statewide and local candidates in the 2002 election in Alabama. The Libertarian Party's successes in the 2000 and 2002 election cycles in Alabama demonstrate that the three-percent signature requirement does not hinder diligent independent and minor party candidates, and Alabama's election law thus "provides a realistic means of access." Libertarian Party, 710 F.2d at 794 (noting that a three-percent signature requirement was not unreasonably burdensome when one minor party qualified its slate of candidates in two election cycles).

For all of these reasons, Alabama's three-percent signature requirement is a reasonable, nondiscriminatory regulation that does not impose a severe burden.[12]

---

[12]In presidential elections, independent candidates need to obtain only 5,000 signatures to appear on the general election ballot in Alabama. See Ala. Code § 17-19-2(a) (2005) (current version at Ala. Code § 17-14-31(a)). Plaintiffs contend that if a less restrictive signature requirement sufficiently satisfies the State's interests in presidential elections, there is no justification for requiring more signatures through the three-percent signature requirement in statewide elections.

However, presidential elections call for a different balancing of interests than statewide or local races. As the Supreme Court emphasized in Anderson, "the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." Anderson, 460 U.S. at 795, 103 S. Ct. at 1573. Accordingly, we cannot say it is unreasonable for

## C.      Filing Deadline Combined with Signature Requirement

Even if a three-percent signature requirement alone passes constitutional muster, plaintiffs also contend that Alabama's filing deadline on the first primary election date, in combination with the three-percent signature requirement, violates the First and Fourteenth Amendments.[13]  Specifically, plaintiffs assert that primary polling sites are critical locations for gathering signatures to meet the three-percent signature requirement, that Alabama's June filing deadline effectively precludes gathering signatures at primary polling sites, and that the filing deadline in tandem with the three-percent signature requirement severely burdens plaintiffs' constitutional rights to ballot access.  Based on our review of binding precedent and the undisputed facts in this case, we conclude that Alabama's June filing deadline, in combination with the three-percent signature requirement, does not place a severe burden on the constitutional rights of independent candidates.

We begin our analysis with Jenness v. Fortson, wherein the Supreme Court rejected a challenge to Georgia's five-percent signature requirement and June filing

---

Alabama to apply more demanding regulations on statewide and local races than presidential races.

[13]Although defendants also assert that this claim is moot absent plaintiffs' expressed intent to run again, plaintiffs are certainly capable of doing so, and it is reasonable to expect that they will do so in the future.  As noted above, ballot access challenges fall under the "capable of repetition, yet evading review" exception to the mootness doctrine.  See Norman, 502 U.S. at 287-88, 112 S. Ct. at 704-05; Libertarian Party, 710 F.2d at 796.

deadline acting in concert.  Jenness, 403 U.S. at 440-42, 91 S. Ct. at 1975-76.

Despite having a similar June filing deadline, the election scheme upheld in

Jenness was significantly more restrictive than Alabama's.  Specifically, the

Georgia statute in Jenness required the signatures of five percent of all registered

voters, unlike the three percent of actual voters in Alabama.  Id. at 432, 91 S. Ct. at

1971.  Moreover, candidates had only 180 days to circulate signature petitions in

Jenness, unlike the unlimited time allowed in Alabama.  Id. at 433, 91 S. Ct. at

1972.  Furthermore, in Jenness, the June filing deadline for independent candidates

to appear on the November general election ballot was the same deadline for a

major party candidate qualifying to appear on an August party primary election

ballot.  Id. at 433-34, 91 S. Ct. at 1972.  The June deadline for independents thus

precluded signature gathering not only on the primary election date but also two

months before the primary election date in August.

In Jenness, the Supreme Court noted that this June filing deadline was not

"unreasonably early," distinguishing it from the February deadline invalidated in

Williams v. Rhodes, 393 U.S. 23, 33, 89 S. Ct. 5, 11 (1968).  Id. at 438, 91 S. Ct. at

1974.  Moreover, the Supreme Court concluded that the absence of "suffocating

restrictions" on signature gathering minimized any burden posed by the deadline,

and it upheld Georgia's five-percent signature requirement and June filing

24

deadline. Id. at 438-40, 91 S. Ct. at 1974-75. As noted repeatedly by the district court in upholding the June filing deadline, the Alabama statute here also imposes none of the "suffocating restrictions" on the circulation of signature petitions outlined in Jenness. See Swanson III, 432 F. Supp. 2d at 1263; Swanson II, 340 F. Supp. 2d at 1299 (citing Jenness, 403 U.S. at 438-39, 91 S. Ct. at 1974); Swanson I, 219 F. Supp. 2d at 1232.

Based on the reasoning in Jenness, other circuits have upheld statutes with filing deadlines on the primary election day (or even the day before) in combination with signature requirements, despite the deadline's effect on signature gathering. See, e.g., Lawrence v. Blackwell, 430 F.3d 368, 375 (6th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 2352 (2006) (upholding Ohio's filing deadline for independent candidates on the day before the primary election date, which is as early as March in presidential election years, with a one-percent signature requirement); Wood v. Meadows, 207 F.3d 708, 713-14 (4th Cir. 2000) (analyzing Virginia's June filing deadline on the primary election date "in conjunction with" its signature requirement of 0.5% of registered voters and concluding that its election scheme "taken as a whole" is constitutional); Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 76-77 (3d Cir. 1999) (concluding that the combination of New Jersey's deadline on the primary election date and signature

25

requirement of up to 1,000 signatures imposed only a minimal burden); Rainbow

Coal. of Okla. v. Okla. State Election Bd., 844 F.2d 740, 747 (10th Cir. 1988)

(holding that a May 31 filing deadline is not unconstitutional "even in conjunction

with the relatively high [five-percent] signature requirement").[14]  While we

recognize that Ohio, Virginia, and New Jersey chose a less restrictive signature

requirement than Alabama's three-percent signature requirement, the five-percent

signature requirement was upheld in Jenness along with an even earlier deadline.

Accordingly, on this record, we have no basis to conclude that Alabama's statute

falls outside the spectrum of constitutional legislative choices.

Plaintiffs do not cite, much less address, Jenness in their initial or reply

briefs.  Instead, plaintiffs rely on the Supreme Court's decision in Anderson v.

Celebrezze and this Court's decision in New Alliance Party v. Hand, 933 F.2d

1568 (11th Cir. 1991).  However, the statutes in those cases are materially different

from Alabama's statute at issue here.

_____

[14]We cite and rely upon the same decisions as did the district court.  In Swanson III, the district court summarized its previous finding in Swanson II that the signature requirement was constitutional.  Swanson III, 432 F. Supp. 2d at 1262.  After noting its resolution of the signature requirement claim, the district court turned to the filing deadline's effect on the signature gathering needed to satisfy the three-percent signature requirement and ultimately upheld Alabama's election scheme.  Id. at 1263-64.  In rejecting the deadline challenge, the district court cited Jenness, Wood, Hooks, and Rainbow Coalition of Oklahoma, each of which denied challenges to a filing deadline operating in conjunction with a signature requirement.  Id. at 1263.  Therefore, the district court's reasoning and cases cited in support of its opinion in Swanson III support the conclusion that Alabama's filing deadline operating in conjunction with the signature requirement is constitutional.

26

Anderson is different in two material ways. First, Anderson involved a presidential election where the Supreme Court noted that "the State has a less important interest in regulating Presidential elections than statewide or local elections . . . ." Anderson, 460 U.S. at 795, 103 S. Ct. at 1573. In contrast, the Alabama statute, challenged by plaintiffs, addresses only statewide and local elections, and a separate Alabama statute not at issue on appeal governs independent presidential candidates. See Ala. Code § 17-19-2(a) (2005) (current version at Ala. Code § 17-14-31(a)).

Second, the Ohio statute in Anderson placed independent candidates at a relative disadvantage to major party candidates. Specifically, the Ohio statute invalidated in Anderson required major party candidates to declare their candidacies by late March in order to be on the primary election ballot, which was seventy-five days later in mid-June. Independent presidential candidates had to file a nominating petition with 5,000 signatures by the same date in late March in order to appear on the general election ballot, which was over seven months later in November. Anderson, 460 U.S. at 782-83 & n.1, 103 S. Ct. at 1566-67 & n.1. In requiring independent candidates to file signature petitions by late March, the Ohio statute thus placed independent candidates at a relative disadvantage to major party candidates because (1) major party candidates alone had the flexibility to respond

27

to intervening events between the March filing deadline and the national nominating conventions five months later, and (2) the early deadline burdened signature gathering when the general election was "far in the future." Id. at 790-92, 103 S. Ct. at 1570-72. This discrimination against independent candidates constituted a severe burden because "[a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." Id. at 793-94, 103 S. Ct. at 1572 (emphasis added).

In Anderson, although major party candidates had to declare their candidacies on the same date as the filing deadline for independent candidates, the Supreme Court noted that "the burdens and the benefits of the respective requirements are materially different . . . ." Id. at 799, 103 S. Ct. at 1575. Specifically, although major party candidates had to declare their candidacies in late March before the party primary to allow reasonable time to prepare the primary election ballots, there was no similar administrative justification for requiring independent candidates to register in late March before the major party primary in June. Id. at 800, 103 S. Ct. at 1576. Additionally, while the major party candidates would benefit from the added publicity and organizational support tied to the party primary elections, independent candidates would gain no

28

corresponding benefit from the lead up to the primary elections. Id. at 800-01, 103 S. Ct. at 1576. Accordingly, as demonstrated in Anderson, courts subject filing deadlines that are well prior to the primary election to more exacting scrutiny. See id. at 805-06, 103 S. Ct. at 1578-79; Wood, 207 F.3d at 711 (noting that courts subject to "searching scrutiny" election schemes requiring both independent and major party candidates to declare their candidacies on the same date prior to the major party's primary election date).

In contrast, Alabama's statute does not discriminate against independent candidates relative to major party candidates when the filing deadline for independent candidates is set on Alabama's primary election date, which is sixty days after major party candidates must declare their candidacies.[15] Although major party candidates enjoy the benefits of the publicity and automatic support of an experienced party organization, major party candidates in Alabama have the additional burden of filing earlier, thus placing independent and major party candidates in comparable positions. See Lawrence, 430 F.3d at 373; Wood, 207 F.3d at 712. Although the Constitution bars states from discriminating against independent and minor party candidates, it does not mandate that states give

---

[15]In Alabama, major party candidates must declare their candidacies sixty days before the first primary election. See Ala. Code § 17-16-11 (2005) (current version at Ala. Code § 17-13-5).

independent and minor party candidates preferential treatment over major party candidates. Timmons, 520 U.S. at 367, 117 S. Ct. at 1374 (concluding that states have no obligation to remove all hurdles facing independent and minor party candidates and that an election scheme "may, in practice, favor the traditional two-party system"); Munro v. Socialist Workers Party, 479 U.S. 189, 198, 107 S. Ct. 533, 539 (1986) ("States are not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot."). By extending the filing deadline for independent and minor party candidates to the primary election date, sixty days after major party candidates must declare their candidacies, Alabama imposes no discriminatory burden on independent and minor party candidates.

Similarly, New Alliance Party v. Hand is distinguishable because the old Alabama statute invalidated in that case was like the Ohio statute in Anderson and placed independent and minor party candidates at a relative disadvantage to major party candidates. In New Alliance Party, this Court addressed Alabama's old election statute, which required local and statewide independent candidates to file their signature petitions in April, sixty days before the primary election. See New Alliance Party, 933 F.2d at 1570 & n.3 (citing Ala. Code § 17-8-2.1 (2005)). This

Court concluded that the early deadline "make[s] it moderately difficult for a minor party candidate to qualify to be on the ballot . . . ." Id. at 1575-76. This Court struck down the election scheme under a strict scrutiny framework, noting that the State failed to "adopt the least drastic means to achieve its ends." Id. at 1576 (internal quotation marks, citation, and alteration omitted).

In New Alliance Party, the April filing deadline placed unequal burdens on independent and minor party candidates (again similar to the late-March filing deadline seventy-five days before the primary election invalidated in Anderson). Just as in Anderson, Alabama's old scheme required independent and minor party candidates to file their petitions on the same day that major party candidates simply declared their candidacies without any of the administrative justifications or corresponding benefits of the major party primary elections. See id. at 1570 & n.3; see also Anderson, 460 U.S. at 800-01, 103 S. Ct. at 1576.

In contrast, as discussed above, Alabama's new June filing deadline on the primary election date does not place independent and minor party candidates at a relative disadvantage to major party candidates. Indeed, major party candidates have the additional burden of declaring their candidacies sixty days before independent and minor party candidates must file their signature petitions in June, and independent and major party candidates thus are in roughly comparable

positions. Accordingly, unlike the April filing deadline invalidated in <u>New Alliance Party</u>, Alabama's new filing deadline is a nondiscriminatory restriction, and the strict scrutiny analysis applied in <u>New Alliance Party</u> is not appropriate for Alabama's filing deadline on the primary election date for independent and minor party candidates.

More importantly in this case, the burden posed by Alabama's filing deadline is significantly lessened by the statute's alleviating factors. In particular, Alabama sets no limit on the time period for conducting the petitioning effort, a far more permissive scheme than filing deadlines that have been upheld in the past.[16] <u>See, e.g.</u>, <u>Am. Party of Tex.</u>, 415 U.S. at 786-87, 94 S. Ct. at 1309 (upholding a statute requiring minor party candidates to gather roughly 400 signatures a day within a 55-day petitioning period); <u>Jenness</u>, 403 U.S. at 433, 442, 91 S. Ct. at 1971-72, 1976 (upholding a five-percent signature requirement with a 180-day petitioning period); <u>Libertarian Party</u>, 710 F.2d at 794 (upholding a three-percent signature requirement with a 188-day petitioning period). Given the unlimited

---

[16]Plaintiffs assert that independent candidates cannot petition more than a year in advance of the primary because of Ala. Code § 17-22A-7(b)(2) (2005) (current version at Ala. Code § 17-5-7(b)(2)), which bars candidates from accepting, soliciting, or receiving campaign contributions more than a year prior to the election. Plaintiffs point to no authority, and we find none, that treats this campaign contributions provision as limiting the petitioning period for ballot access. The ballot access provision at issue in this case contains no explicit limitation on the period for gathering signatures. Ala. Code § 17-8-2.1(a)(1) (2005). Even if Alabama had a twelve-month petitioning period, this would essentially double the petitioning periods in <u>Libertarian Party</u> and <u>Jenness</u>.

32

petitioning window, a diligent independent or minor party candidate could meet the filing deadline by collecting signatures many months before the June primary deadline.

Plaintiffs attempt to sidestep the clear precedent in <u>Jenness</u> by pointing to evidence that few independent and minor party candidates have been able to obtain access to Alabama's ballot since both the three-percent signature requirement and June filing deadline have been in place. Since the signature filing deadline was moved to the primary election date in the 2002 election cycle, two independent candidates obtained ballot access in 2002 despite the short notice of the deadline change, two independent candidates obtained ballot access in 2004, and six independent and minor party candidates obtained ballot access in 2006.

Although plaintiffs note that these candidates were running for only local races and that no independent or minor party candidate has obtained ballot access in a statewide race since 2002, there is no evidence in this particular record that an independent or minor party candidate has even sought ballot access in a statewide race since plaintiff Swanson in 2002. Moreover, there is no evidence in the record in this case that any independent or minor party candidate sought and failed to gain ballot access in any Alabama races since plaintiffs in 2002. All we say here is that the evidence in this particular record does not establish any severe burden on

33

rights; instead, the successes of several independent and minor party candidates demonstrate that Alabama's election scheme does not "completely insulate the two-party system from minor parties' or independent candidates' competition and influence . . . ." Timmons, 520 U.S. at 367, 117 S. Ct. at 1374; see also Cartwright, 304 F.3d at 1141 (upholding Georgia's signature requirement even though no Libertarian Party candidate had ever satisfied it); Libertarian Party, 710 F.2d at 794 (concluding that Florida law "does not freeze the status quo but provides a realistic means of access" based on one minor party's success in qualifying a slate of candidates in two election cycles).

Plaintiffs also point to Winger's testimony that Alabama had the second toughest ballot access restrictions among all states in the 2002 election. This Court in Libertarian Party instructed that the legislative choices of other states are irrelevant, however, because a court is "no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." Libertarian Party, 710 F.2d at 794. Furthermore, the Supreme Court has upheld a broad array of election schemes, and we confine our inquiry to whether Alabama's election scheme is constitutional, not whether Alabama's scheme is the best relative to other states. See Green, 155 F.3d at 1339 ("There is a range of fees and signature requirements that are

34

constitutional, and [a state] legislature is free to choose its ballot access requirements from that constitutional spectrum.").

Further, plaintiffs point to no case in which a court has invalidated a filing deadline on the primary election day combined with a signature requirement similar to Alabama's laws. Because Alabama does not discriminate against independent and minor party candidates, and because there are significant alleviating factors in Alabama's statute, such as the unlimited time to gather signatures, we conclude that Alabama's filing deadline on the primary election date, in tandem with the three-percent signature requirement, is a reasonable, nondiscriminatory regulation.

**D.     State Interests**

Because Alabama's filing deadline on the June primary election date in combination with its three-percent signature requirement imposes reasonable, nondiscriminatory restrictions on plaintiffs' rights, "less exacting review" of Alabama's election regulations is proper. Timmons, 520 U.S. at 358, 117 S. Ct. at 1370. Under this review, we conclude that important state interests provide sufficient justification for these reasonable, nondiscriminatory regulations. See id. Specifically, defendants identify various state interests supporting the regulations,

35

such as avoiding voter confusion and promoting political stability.[17]

The district court found that Alabama had "an important interest in requiring independent candidates to show they had a significant modicum of support before printing their names on the ballot." Swanson II, 340 F. Supp. 2d at 1299 (quotation marks and citation omitted). By requiring candidates to demonstrate a modicum of support, Alabama discourages frivolous candidacies and thereby serves its important interests in "avoiding confusion, deception, and even frustration of the democratic process at the general election." Jenness, 403 U.S. at 442, 91 S. Ct. at 1976. This Court previously has recognized that signature requirements promote the important state interest of ensuring that only bona fide independent candidates with a measure of support gain ballot access, preventing

---

[17]The parties also contest whether Alabama's election scheme serves an important state interest in discouraging "sore loser" candidates who lose in a major party primary election and attempt to run as independent candidates. The filing deadline on the primary election date clearly serves this interest because a losing candidate in a major party primary could not qualify on the same day as an independent candidate.

However, Alabama already has a separate "sore loser" statute that states that ballots shall not include "the name of any independent candidate who was a candidate in the primary election of that year and the name of any nominee of a political party who was a candidate for the nomination of a different political party in the primary election of that year." Ala. Code § 17-7-1(c) (2005) (current version at Ala. Code § 17-9-3(b)). The early filing deadline is thus superfluous in the context of preventing "sore losers," and we do not consider this interest to justify Alabama's restrictions. See Anderson, 460 U.S. at 804-05 & n.31, 103 S. Ct. at 1578 & n.31 (noting that an early filing deadline was not precisely drawn to discourage "sore losers" when the state had a separate "sore loser" statute); New Alliance Party, 933 F.2d at 1576 & n.21 (finding that this otherwise legitimate state interest was already protected by Alabama's separate "sore loser" statute). But see Hooks, 179 F.3d at 80 & n.18 (concluding that a filing deadline on the primary election date served an important state interest in preventing "sore losers" even though the state had a separate disaffiliation statute).

frivolous candidates from clogging the ballot and confusing voters. See

Cartwright, 304 F.3d at 1142; Libertarian Party, 710 F.2d at 792-93; see also

Fulani v. Krivanek, 973 F.2d 1539, 1547 (11th Cir. 1992) (noting that a signature

requirement promotes the interest in demonstrating a modicum of support).

Accordingly, Alabama's election scheme as a whole promotes the State's

important interest in limiting ballot access to candidates with a modicum of

support, thus avoiding voter confusion.

Moreover, reasonable ballot access regulations promote important state

interests in preserving political stability by "temper[ing] the destabilizing effects of

party-splintering and excessive factionalism." Timmons, 520 U.S. at 367, 117 S.

Ct. at 1374; see also Storer, 415 U.S. at 735, 94 S. Ct. at 1282 (recognizing a state

interest in discouraging "independent candidacies prompted by short-range

political goals, pique, or personal quarrel"). Although this interest in political

stability does not permit states to "completely insulate the two-party system from

minor parties' or independent candidates' competition and influence," this interest

justifies reasonable restrictions that "may, in practice, favor the traditional two-

party system . . . ." Timmons, 520 U.S. at 367, 117 S. Ct. at 1374. By placing

reasonable restrictions on ballot access for independent and minor party

candidates, Alabama's election scheme discourages party-splintering and

37

factionalism that could destabilize the political system. See id. (noting that state legislatures may conclude that political stability is best served through a healthy two-party system); Storer, 415 U.S. at 736, 94 S. Ct. at 1282 ("California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government.").[18]

Plaintiffs do not dispute that Alabama has legitimate, important interests in avoiding voter confusion and promoting political stability. Instead, plaintiffs contend that defendants failed to prove that the signature requirement and filing deadline were necessary to promote these important interests. However, this argument misapprehends the proper test for reasonable, nondiscriminatory regulations. Because any percentage requirement or filing deadline is "necessarily arbitrary" and "impossible to defend . . . as either compelled or least drastic," the test is not whether the regulations are necessary but whether they rationally serve important state interests. Libertarian Party, 710 F.2d at 793 (quotation marks omitted); see also Timmons, 520 U.S. at 358, 117 S. Ct. at 1370 (noting that a state

---

[18]Additionally, the district court noted defendants' contention that "Alabama needs the additional time afforded by the earlier, first-primary-election deadline to verify petition signatures and to perform other administrative duties connected to the election cycle." Swanson III, 432 F. Supp. 2d at 1263. Plaintiffs do not dispute this interest, and we conclude that this is an additional important interest justifying Alabama's ballot access restrictions. See Wood, 207 F.3d at 715 ("Administrative convenience readily falls under the rubric of a state's 'regulatory interests,' the importance of which the Supreme Court has repeatedly recognized.").

38

does not need to establish that ballot access restrictions are narrowly tailored and necessary to promote its interests unless the restrictions severely burden rights). Moreover, the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." Munro, 479 U.S. at 194-95, 107 S. Ct. at 537. Because state legislatures "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively," Alabama was not required to present evidence in support of its professed interests. Id. at 195, 107 S. Ct. at 537.

Alabama has articulated important interests justifying its reasonable, nondiscriminatory ballot access restrictions. Accordingly, we conclude that Alabama's election scheme, with a three-percent signature requirement and filing deadline on the primary election date, does not abridge plaintiffs' First and Fourteenth Amendment rights.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to defendants on all claims.[19]

---

[19]Plaintiffs also request a reversal of the district court's denial of their September 18, 2002 motion for attorney's fees and costs, pursuant to 42 U.S.C. § 1988. On October 25, 2002, the district court denied plaintiffs' motion for attorney's fees and costs "with leave to renew in a timely manner after a final judgment has been entered." However, plaintiffs never refiled a

**AFFIRMED**.

---

motion for attorney's fees and costs following entry of final judgment, and the district court thus never addressed the merits of this request. Accordingly, the request for attorney's fees and costs is not properly presented to this Court on appeal.