Justice Scalia,
with whom Justice Kennedy joins, dissenting.
The electorate’s perception of a political party’s beliefs is colored by its perception of those who support the party; and a party’s defining act is the selection of a candidate and advocacy of that candidate’s election by conferring upon him the party’s endorsement. When the state-printed ballot for the general election causes a party to be associated with candidates who may not fully (if at all) represent its views, it undermines both these vital aspects of political association. The views of the self-identified party supporter color perception of the party’s message, and that self-identification on the ballot, with no space for party repudiation or party identification of its own candidate, impairs the party’s advocacy of its standard bearer. Because Washington has not demonstrated that this severe burden upon parties’ associational rights is narrowly tailored to serve a compelling interest— indeed, because it seems to me Washington’s only plausible interest is precisely to reduce the effectiveness of political parties — I would find the law unconstitutional.
I
I begin with the principles on which the Court and I agree. States may not use election regulations to undercut political *463 parties’ freedoms of speech or association. See U S. Term Limits, Inc. v. Thornton, 514 U. S. 779, 833-834 (1995). Thus, when a State regulates political parties as a part of its election process, we consider “the ‘character and magnitude’” of the burden imposed on the party’s associational rights and “the extent to which the State’s concerns make the burden necessary.” Timmons v. Twin Cities Area New Party, 520 U. S. 351, 358 (1997). Regulations imposing severe burdens must be narrowly tailored to advance a compelling state interest. Ibid.
Among the First Amendment rights that political parties possess is the right to associate with the persons whom they choose and to refrain from associating with persons whom they reject. Democratic Party of United States v. Wisconsin ex rel. La Follette, 450 U. S. 107, 122 (1981). Also included is the freedom to choose and promote the “ ‘standard bearer who best represents the party’s ideologies and preferences.’” Eu v. San Francisco County Democratic Central Comm., 489 U. S. 214, 224 (1989).
When an expressive organization is compelled to associate with a person whose views the group does not accept, the organization’s message is undermined; the organization is understood to embrace, or at the very least tolerate, the views of the persons linked with them. We therefore held, for example, that a State severely burdened the right of expressive association when it required the Boy Scouts to accept an openly gay scoutmaster. The scoutmaster’s presence “would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior.” Boy Scouts of America v. Dale, 530 U. S. 640, 653 (2000).
A political party’s expressive mission is not simply, or even primarily, to persuade voters of the party’s views. Parties seek principally to promote the election of candidates who will implement those views. See, e. g., Tashjian v. Republi *464 can Party of Conn., 479 U. S. 208, 216 (1986); Storer v. Brown, 415 U. S. 724, 745 (1974); M. Hershey & P. Beck, Party Politics in America 13 (10th ed. 2003). That is achieved in large part by marking candidates with the party’s seal of approval. Parties devote substantial resources to making their names trusted symbols of certain approaches to governance. See, e.g., App. 239 (declaration of Democratic Committee Chair Paul J. Berendt); J. Aldrich, Why Parties? 48-49 (1995). They then encourage voters to cast their votes for the candidates that carry the party name. Parties’ efforts to support candidates by marking them with the party trademark, so to speak, have been successful enough to make the party name, in the words of one commentator, "the most important resource that the party possesses.” Cain, Party Autonomy and Two-Party Electoral Competition, 149 U. Pa. L. Rev. 793,804 (2001). And all evidence suggests party labels are indeed a central consideration for most voters. See, e. g., id., at 804, n. 34; Rahn, The Role of Partisan Stereotypes in Information Processing About Political Candidates, 37 Am. J. Pol. Sci. 472 (1993); Klein & Baum, Ballot Information and Voting Decisions in Judicial Elections, 54 Pol. Research Q. 709 (2001).
II
A
The State of Washington need not like, and need not favor, political parties. It is entirely free to decline running primaries for the selection of party nominees and to hold nonpartisan general elections in which party labels have no place on the ballot. See California Democratic Party v. Jones, 530 U. S. 567, 585-586 (2000). Parties would then be left to their own devices in both selecting and publicizing their candidates. But Washington has done more than merely decline to make its electoral machinery available for party building. Recognizing that parties draw support for their candidates by giving them the party imprimatur, Washing *465 ton seeks to reduce the effectiveness of that endorsement by allowing any candidate to use the ballot for drawing upon the goodwill that a party has developed, while preventing the party from using the ballot to reject the claimed association or to identify the genuine candidate of its choice. This does not merely place the ballot off limits for party building; it makes the ballot an instrument by which party building is impeded, permitting unrebutted associations that the party itself does not approve.
These cases cannot be decided without taking account of the special role that a state-printed ballot plays in elections. The ballot comes into play “at the most crucial stage in the electoral process — the instant before the vote is cast.” Anderson v. Martin, 375 U. S. 399, 402 (1964). It is the only document that all voters are guaranteed to see, and it is “the last thing the voter sees before he makes his choice,” Cook v. Gralike, 531 U. S. 510, 532 (2001) (Rehnquist, C. J., concurring in judgment). Thus, we have held that a State cannot elevate a particular issue to prominence by making it the only issue for which the ballot sets forth the candidates’ positions. Id., at 525-526 (opinion of the Court). And we held unconstitutional California’s election system, which listed as the party’s candidate on the general-election ballot the candidate selected in a state-run “blanket primary” in which all citizens could determine who would be the party’s nominee. Jones, 530 U. S., at 586. It was not enough to sustain the law that the party remained free to select its preferred candidate through another process, and could denounce or campaign against the candidate carrying the party’s name on the general-election ballot. Forced association with the party on the general-election ballot was fatal. Id., at 575-577.
The Court makes much of the fact that the party names shown on the Washington ballot may be billed as mere statements of candidate “preference.” See ante, at 454-457. To be sure, the party is not itself forced to display favor for someone it does not wish to associate with, as the Boy Scouts *466 were arguably forced to do by employing the homosexual scoutmaster in Dale, and as the political parties were arguably forced to do by lending their ballot endorsement as party nominee in Jones. But thrusting an unwelcome, self-proclaimed association upon the party on the election ballot itself is amply destructive of the party’s associational rights. An individual’s endorsement of a party shapes the voter’s view of what the party stands for, no less than the party’s endorsement of an individual shapes the voter’s view of what the individual stands for. That is why party nominees are often asked (and regularly agree) to repudiate the support of persons regarded as racial extremists. On Washington’s ballot, such repudiation is impossible. And because the ballot is the only document voters are guaranteed to see, and the last thing they see before casting their vote, there is “no means of replying” that “would be equally effective with the voter.” Cook, supra, at 532 (Rehnquist, C. J., concurring in judgment).
Not only is the party’s message distorted, but its goodwill is hijacked. There can be no dispute that candidate acquisition of party labels on Washington’s ballot — even if billed as self-identification — is a means of garnering the support of those who trust and agree with the party. The “I prefer the D’s” and “I prefer the R’s” will not be on the ballot for esthetic reasons; they are designed to link candidates to unwilling parties (or at least parties who are unable to express their revulsion) and to encourage voters to cast their ballots based in part on the trust they place in the party’s name and the party’s philosophy. These harms will be present no matter how Washington’s law is implemented. There is therefore “no set of circumstances” under which Washington’s law would not severely burden political parties, see United States v. Salerno, 481 U. S. 739, 745 (1987), and no good reason to wait until Washington has undermined its political parties to declare that it is forbidden to do so.
*467 B
The Chief Justice would wait to see if the law is implemented in a manner that no more harms political parties than allowing a person to state that he “ ‘like[s] Campbell’s soup’ ” would harm the Campbell Soup Company. See ante, at 461 (concurring opinion). It is hard to know how to respond. First and most fundamentally, there is simply no comparison between statements of “preference” for an expressive association and statements of “preference” for soup. The robust First Amendment freedom to associate belongs only to groups “engage[d] in ‘expressive association,’” Dale, 530 U. S., at 648. The Campbell Soup Company does not exist to promote a message, and “there is only minimal constitutional protection of the freedom of commercial association,” Roberts v. United States Jay cees, 468 U. S. 609, 634 (1984) (O’Connor, J., concurring in part and concurring in judgment).
Second, I assuredly do not share The Chief Justice’s view that the First Amendment will be satisfied so long as the ballot “is designed in such a manner that no reasonable voter would believe that the candidates listed there are nominees or members of, or otherwise associated with, the parties the candidates claimed to ‘prefer.’” Ante, at 460. To begin with, it seems to me quite impossible for the ballot to satisfy a reasonable voter that the candidate is not “associated with” the party for which he has expressed a preference. He has associated himself with the party by his very expression of a preference — and that indeed is the whole purpose of allowing the preference to be expressed. If all The Chief Justice means by “associated with” is that the candidate “does not speak on the party’s behalf or with the party’s approval,” ante, at 461, none of my analysis in this opinion relies upon that misperception, nor upon the misperception that the candidate is a member or the nominee of the party. Avoiding those misperceptions is far from enough. *468 Is it enough to say on the ballot that a notorious and despised racist who says that the party is his choice does not speak with the party’s approval? Surely not. His unrebutted association of that party with his views distorts the image of the party nonetheless. And the fact that the candidate who expresses a “preference” for one or another party is shown not to be the nominee of that party does not deprive him of the boost from the party’s reputation which the party wishes to confer only on its nominee. The Chief Justice claims that “the content of the ballots in the pertinent respect is yet to be determined,” ante, at 460. I disagree. We know all we need to know about the form of ballot. When pressed, Washington’s attorney general assured us at oral argument that the ballot will not say whether the party for whom the candidate expresses a preference claims or disavows him. (Of course it will not, for that would enable the party expression that it is the very object of this legislation to impair.)
And finally, while The Chief Justice earlier expresses his awareness that the special character of the ballot is what makes these cases different, ante, at 460, his Campbell’s Soup example seems to forget that. If we must speak in terms of soup, Washington’s law is like a law that encourages Oscar the Grouch (Sesame Street’s famed bad-taste resident of a garbage can) to state a “preference” for Campbell’s at every point of sale, while barring the soup company from disavowing his endorsement, or indeed using its name at all, in those same crucial locations. Reserving the most critical communications forum for statements of “preference” by a potentially distasteful speaker alters public perceptions of the entity that is “preferred”; and when this privileged connection undermines not a company’s ability to identify and promote soup but an expressive association’s ability to identify and promote its message and its standard bearer, the State treads on the constitutionally protected freedom of association.
*469 The majority opinion and The Chief Justice’s concurrence also endorse a wait-and-see approach on the grounds that it is not yet evident how the law will affect voter perception of the political parties. But contrary to the Court’s suggestion, it is not incumbent on the political parties to adduce “evidence,” ante, at 457, that forced association affects their ability to advocate for their candidates and their causes. We have never put expressive groups to this perhaps-impossible task. Rather, we accept their own assessments of the matter. The very cases on which The Chief Justice relies for a wait-and-see approach, ante, at 459-460, establish as much. In Dale, for example, we did not require the Boy Scouts to prove that forced acceptance of the openly homosexual scoutmaster would distort their message. See 530 U. S., at 653 (citing La Follette, 450 U. S., at 123-124). Nor in Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U. S. 557 (1995), did we require the organizers of the St. Patrick’s Day Parade to demonstrate that including a gay contingent in the parade would distort their message. See id., at 577. Nor in Jones, 530 U. S. 567, did we require the political parties to demonstrate either that voters would incorrectly perceive the “nominee” labels on the ballot to be the products of party elections or that the labels would change voter perceptions of the party. It does not take a study to establish that when statements of party connection are the sole information listed next to candidate names on the ballot, those statements will affect voters’ perceptions of what the candidate stands for, what the party stands for, and whom they should elect.
III
Since I conclude that Washington’s law imposes a severe burden on political parties’ associational rights, I would uphold the law only if it were “narrowly tailored” to advance “a compelling state interest.” Timmons, 520 U. S., at 358. Neither the Court’s opinion nor the State’s submission claims that Washington’s law passes such scrutiny. The State ar *470 gues only that it “has a rational basis” for “providing voters with a modicum of relevant information about the candidates,” Brief for Petitioners in No. 06-730, pp. 48-49. This is the only interest the Court’s opinion identifies as well. Ante, at 458.
But “rational basis” is the least demanding of our tests; it is the same test that allows individuals to be taxed at different rates because they are in different businesses. See Allied Stores of Ohio, Inc. v. Bowers, 358. U. S. 522, 526-527 (1959). It falls far, far short of establishing the compelling state interest that the First Amendment requires. And to tell the truth, here even the existence of a rational basis is questionable. Allowing candidates to identify themselves with particular parties on the ballot displays the State’s view that adherence to party philosophy is “an important— perhaps paramount — consideration in the citizen’s choice.” Anderson, 375 U. S., at 402. If that is so, however, it seems to me irrational not to allow the party to disclaim that self-association, or to identify its own endorsed candidate.
It is no mystery what is going on here. There is no state interest behind this law except the Washington Legislature’s dislike for bright-colors partisanship, and its desire to blunt the ability of political parties with noncentrist views to endorse and advocate their own candidates. That was the purpose of the Washington system that this enactment was adopted to replace — a system indistinguishable from the one we invalidated in Jones, which required parties to allow nonmembers to join in the selection of the candidates shown as their nominees on the election ballot. (The system was held unconstitutional in Democratic Party of Washington State v. Reed, 343 F. 3d 1198 (CA9 2003).) And it is the obvious purpose of Washington legislation enacted after this law, which requires political parties to repeat a candidate’s self-declared party “preference” in electioneering communications concerning the candidate — even if the purpose of the communication is to criticize the candidate and to disavow *471 any connection between him and the party. Wash. Rev. Code § 42.17.510(1) (2006); see also Wash. Admin. Code § 390-18-020 (2007).
Even if I were to assume, however, that Washington has a legitimate interest in telling voters on the ballot (above all other things) that a candidate says he favors a particular political party; and even if I were further to assume (per impossibile) that that interest was a compelling one; Washington would still have to “narrowly tailor” its law to protect that interest with minimal intrusion upon the parties’ associational rights. There has been no attempt to do that here. Washington could, for example, have permitted parties to disclaim on the general-election ballot the asserted association or to designate on the ballot their true nominees. The course the State has chosen makes sense only as an effort to use its monopoly power over the ballot to undermine the expressive activities of the political parties.
The right to associate for the election of candidates is fundamental to the operation of our political system, and state action impairing that association bears a heavy burden of justification. Washington’s electoral system permits individuals to appropriate the parties’ trademarks, so to speak, at the most crucial stage of election, thereby distorting the parties’ messages and impairing their endorsement of candidates. The State’s justification for this (to convey a “modicum of relevant information”) is not only weak but undeserving of credence. We have here a system which, like the one it replaced, does not merely refuse to assist, but positively impairs, the legitimate role of political parties. I dissent from the Court’s conclusion that the Constitution permits this sabotage.